DAVID LAFRENZ, ADMINISTRATOR OF THE ESTATE OF LINDA LAFRENZ, DECEASED *v.* LAKE COUNTY FAIR BOARD, HAL FOLTZ, PRESIDENT; LAKE COUNTY COMMISSIONERS.

[No. 3-975A189. Filed March 3, 1977.]

*James R. Bielefeld,* of Crown Point, for appellant.

*Michael L. Muenich, Hand, Muenich & Rodovich,* of Hammond, for appellee Fair Board, *Timothy M. Swan, Spangler, Jennings, Spangler & Dougherty,* of Crown Point, for appellee Variety Attractions, Inc.

HOFFMAN, J.—On August 19, 1972, Linda LaFrenz was fatally injured when an automobile participating in a demolition derby jumped a barrier striking her. At the time of the occurrence, the decedent was standing in the pit area. Before entering the pit area, decedent had executed an instrument entitled, "WAIVER AND RELEASE FROM LIABILITY AND INDEMNITY AGREEMENT." Appellant David LaFrenz, Administrator of the Estate of Linda LaFrenz, filed a complaint to recover damages from the various defendants.[1] Defendants-appellees Lake County Fair Board and Variety Attractions, Inc. moved for summary judgment based on the release. Such motions were sustained by the trial court on October 24, 1974.

Appellant brings this appeal contending that there are genuine issues of material fact which preclude the entry of summary judgment. Appellant asserts that these fact issues involve the decedent's state of mind as to whether she knowingly and willingly assumed the risk and as to whether she knowingly and willingly signed the release.

In reviewing the propriety of a summary judgment, the materials on file are to be liberally construed in favor of the opponent of the motion, and any doubt as to the existence of a genuine issue of material fact must be resolved against the proponent of the motion. *Collins v. Dunifon.* (1975), 163 Ind. App. 201, 323 N.E.2d 264.

1. On February 26, 1973, the trial court entered a default judgment against defendant Ronald Halcomb, Sr. The Lake County Commissioners, J. J. Forszt, Stanley Olszewski and Martin Behnke were granted summary judgment on April 18, 1974. This appeal does not involve any of these defendants.

Appellant David LaFrenz testified in his deposition that a demolition derby was to be held at the Lake County Fair on August 19, 1972. Approximately four to six weeks prior to August 19, 1972, Linda LaFrenz signed an entry blank to participate in the demolition derby. She had attended demolition derbies previously. In 1970 she observed a demolition derby from the grandstand, and in 1971 she worked in a booth selling tickets. She was aware of the nature of a demolition derby in that the cars would crash into each other.

On August 19, 1972, the demolition derby was scheduled for two sessions—one in the afternoon and another in the evening. Linda LaFrenz was in the pit area during both sessions. She signed documents to be in the pit area as opposed to the grandstand area. She executed a document entitled, "WAIVER AND RELEASE FROM LIABILITY AND INDEMNITY AGREEMENT" which stated that in consideration of being permitted in the "RESTRICTED AREA"[2] she agreed to release the appellees "from all liability to the Undersigned, his personal representatives, assigns, heirs and next of kin for all loss or damage, and any claim or demands therefor, on account of injury to the person or property or resulting in death to the Undersigned, whether caused by the negligence of Releasees or otherwise while the Undersigned is upon the Restricted Area." The agreement also contained a provision in which Linda LaFrenz agreed to indemnify and hold the Releasees harmless for "any loss, liability, damage or cost they may incur due to the presence of the Undersigned in or about the Restricted Area and whether caused by the negligence of the Releasees or otherwise."

Linda LaFrenz was issued a pit pass for the evening session after signing in. She obtained the pit pass to assist her husband, David LaFrenz, as a helper or mechanic.

2. The "RESTRICTED AREA" was defined as being "the area to which admission for the general public is prohibited, including but not limited to the pit area, racing surface and infield, including walkways, concessions and other appurtenances therein."

Later that evening, while standing in the pit area, an automobile participating in the demolition derby jumped the arena barrier striking Linda LaFrenz. She subsequently died from these injuries.

At the time of the occurrence, Linda LaFrenz was twenty-six years of age, had graduated from high school, and had attended two years as a part-time student at Indiana University Northwest.

Before considering whether the release bars recovery in the immediate case, the public policy ramifications of exculpatory agreements should be examined. In this respect, parties are generally permitted to agree in advance that one is under no obligation of care for the benefit of the other, and shall not be liable for the consequences of conduct which would otherwise be negligent. Prosser, *Law of Torts,* § 68, at 442 (4th Ed. 1971).

Thus, in the absence of legislation to the contrary, there is ordinarily no public policy which prevents parties from contracting as they see fit. Consequently, it is not against public policy to enter into an agreement which exculpates one from the consequences of his own negligence. *Weaver* v. *American Oil Co.* (1971), 257 Ind. 458, 276 N.E.2d 144, 49 A.L.R.3d 306; *Indiana State Highway Commission* v. *Thomas* (1976), 169 Ind. App. 13, 346 N.E.2d 252 (transfer denied); *Vernon Fire & Casualty Insurance Co.* v. *Graham* (1975), 166 Ind. App. 509, 336 N.E.2d 829; *Loper* v. *Standard Oil Company et al.* (1965), 138 Ind. App. 84, 211 N.E.2d 797. *See also,* 57 Am. Jur.2d, *Negligence,* §§ 20, *et seq.,* at 362; Restatement of Contracts, § 574, at 1079; § 575, at 1080 (1932); Annot., 68 A.L.R.3d 7 (1976); Annot., 49 A.L.R.3d 321 (1973); Annot., 8 A.L.R.3d 1393 (1966); Annot., 175 A.L.R. 8 (1948).

Other jurisdictions which have addressed the question in the context of race track release forms have upheld the validity of the releases as against challenges that such were against

public policy. *Morrow* v. *Auto Championship Racing Ass'n, Inc.* (1972), 8 Ill. App.3d 682, 291 N.E.2d 30; *Winterstein* v. *Wilcom* (1972), 16 Md. App. 130, 293 A.2d 821; *Theroux* v. *Kedenburg Racing Association* (1965), 50 Misc.2d 97, 269 N.Y.S.2d 789; *Seymour* v. *New Bremen Speedway, Inc.* (1971), 31 Ohio App.2d 141, 287 N.E.2d 111; *French* v. *Special Services, Inc.* (1958), 107 Ohio App. 435, 159 N.E.2d 785.

However, there are several exceptions to the general rule that exculpatory clauses are not against public policy. For example, the Legislature has recently enacted a statute declaring all agreements in construction or design contracts (except highway contracts), which purport to indemnify the promisee against liability arising from the sole negligence or wilful misconduct of the promisee, void as against public policy. IC 1971, 26-2-5-1 (Burns Supp. 1976).

Prosser, in his work on torts, notes several other exceptions to the general rule. One proviso is that the relationship of the parties must be such that their bargaining be free and open. Thus where one party is at such an obvious disadvantage in bargaining power that the effect of the contract is to put him at the mercy of the other's negligence, the contract is void as against public policy. This proviso is applicable on this basis between employer and employee. Prosser, *Law of Torts, supra,* § 68, at 442 (4th Ed. 1971).

A second exception noted by Prosser arises in transactions affecting the public interest, such as public utilities, common carriers, innkeepers, and public warehousemen. *Id.* at 443. Likewise, it is against public policy in Indiana for a railway company, acting as a common carrier, to contract for indemnity against its own tort liability when it is performing either a public or quasi public duty such as that owing to a shipper, passenger, or servant. *The Pennsylvania Railroad Co.* v. *Kent* (1964), 136 Ind. App. 551, 560, 198 N.E.2d 615,

14 A.L.R.3d 434 (transfer denied, 246 Ind. 101, 202 N.E.2d 893).

This exception has been extended to other professional bailees who are under no public duty but who deal with the public, such as garagemen, owners of parking lots, and of parcel checkrooms, on the ground that the indispensable need for their services deprives the customer of all real equal bargaining power. Prosser, *Law of Torts, supra,* at 443-44. *General Grain, Inc.* v. *Internat'l. Harvester Co.* (1968), 142 Ind. App. 12, 232 N.E.2d 616 (transfer denied).

Prosser finally notes that exculpatory agreements are not construed to cover the more extreme forms of negligence or any conduct which constitutes an intentional tort. Prosser, *Law of Torts, supra,* at 444-45.

The leading case in Indiana on exculpatory provisions is *Weaver* v. *American Oil Co., supra* (1971), 257 Ind. 458, 276 N.E.2d 144, 49 A.L.R.3d 306, wherein our Supreme Court struck down an exculpatory clause in a commercial lease arrangement. The court, at 464 of 257 Ind., at 148 of 276 N.E. 2d, stated:

"When a party can show that the contract, which is sought to be enforced, was in fact an unconscionable one, due to a prodigious amount of bargaining power on behalf of the stronger party, which is used to the stronger party's advantage and is unknown to the lesser party, causing a great hardship and risk on the lesser party, the contract provision, or the contract as a whole, if the provision is not separable, should not be enforceable on the grounds that the provision is contrary to public policy. The party seeking to enforce such a contract has the burden of showing that the provisions were explained to the other party and *came to his knowledge* and there was in fact a *real and voluntary meeting of the minds and not merely an objective meeting.*"

The court went on to explain that it did not mean to infer that parties may not make contracts exculpating one of his negligence, but that it must be done "knowingly and willingly."

In the case at bar, there was no unequal bargaining power between the parties. The decedent was under no compulsion, economic or otherwise, to be in the restricted pit area. *See, Winterstein* v. *Wilcom, supra* (1972), 16 Md.App. 130, 293 A.2d 821.

Likewise, the activity did not exhibit any of the characteristics of one affected with the public interest. In *Winterstein* v. *Wilcom, supra,* the court quoted from *Tunkl* v. *Regents of University of California* (1963), 60 Cal.2d 92, 383 P.2d 441, at 445-46, 32 Cal.Rptr. 33, 6 A.L.R.3d 693, as listing the criteria for determining whether particular contracts are affected with the public interest, as follows:

" 'Thus the attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.' "

*Winterstein* v. *Wilcom, supra,* notes a further refinement in instances where a safety statute enacted for the protection of the public is violated. The rationale is that the obligation and the right created by the statute are public ones which are not within the power of any private individual to waive.

We must therefore turn to an examination of the release to determine whether such was "knowingly and willingly" made. The "WAIVER AND RELEASE FROM LIABILITY AND INDEMNITY AGREEMENT" clearly reveals that its sole purpose was to relieve the appellees of liability which may arise from permitting appellant's decedent to be in the restricted pit area. The release was to include all liability which may arise on account of injury to person or property whether caused by the negligence of appellees or otherwise. This situation is different from that which arose in *Weaver* in which the clause there in question *"was in fine print* and *contained no title heading* which would have identified it as an indemnity clause."  (At 462 of 257 Ind., at 147 of 276 N.E.2d.)  Moreover, in the case at bar, each and every signature line contains printing in bold, black print approximately 3/16th inch, stating "THIS IS A RELEASE." Such printing is placed upon the signature line in such a manner that one who signs the instrument is superimposing his signature over such printing. Thus, the uncontroverted facts indicate that the decedent did execute the "WAIVER AND RELEASE FROM LIABILITY AND INDEMNITY AGREEMENT"; the form and language of the agreement explicitly refers to the appellees' negligence; and the decedent could not have signed the instrument without seeing the wording "THIS IS A RELEASE." Thus the form and language is so conspicuous that reasonable men could not reach different conclusions on the question whether the deceased "knowingly and willingly" signed the document. *See, Hewitt* v. *Miller* (1974), 11 Wash.App. 72, 521 P.2d 244.

Appellant asserts that decedent may have been misinformed concerning the nature of the agreement. In his deposition, Ronald Halcomb, Sr., the driver of the automobile which struck decedent, testified that someone, whom he assumed to be an official, stated that the form was an insurance form.

Appellant, however, was with decedent when she signed in for the evening session. He did not assert that such a representation was made.

Thus, we are faced with a situation in which appellant is attempting to raise an inference that such representations were made to the decedent by showing that similar representations were made to others.

However, this assertion alone would not be sufficient to establish a genuine issue of material fact involving misrepresentation. Generally proof of representations made by appellees to persons other than the decedent does not tend to establish that such representations were made to decedent.

In McCormick et al. on Evidence, § 197, at 468-69 (2d Ed. 1972), three alternative theories are recognized to support the admission of evidence of other misrepresentations of a party in order to raise an inference that such party probably engaged in the misconduct charged.

However, McCormick recognizes that misrepresentations made by defendants to persons other than plaintiff would not, standing alone, be sufficient to establish the issue that the misrepresentations charged were made to plaintiff.

Thus, Halcomb's statement does not raise a genuine issue of material fact which would preclude a summary judgment. The trial court therefore did not err in granting the appellees' respective motions for summary judgment.

Affirmed.

Staton, P.J. and Garrard, J., concur.

NOTE.—Reported at 360 N.E.2d 605.