June GRBAC, Administratrix of the Estate of Michael J. Grbac, Deceased, Plaintiff,

v.

READING FAIR COMPANY, INC., Fair Investment Company, Inc., Reading Stock Cars, Inc., Reading Stock Car Racing Association and Lindy V. Vicari, Defendants.

Civ. A. No. 80–46.

United States District Court, W. D. Pennsylvania.

Sept. 18, 1981.

Henry H. Wallace, Wallace, Chapas & Gravina, Pittsburgh, Pa., for plaintiff.

Warren D. Ferry, Murovich, Reale & Fossee, Pittsburgh, Pa., for defendants.

## MEMORANDUM OPINION

COHILL, District Judge.

On October 29, 1978, Michael Grbac sustained fatal injuries while driving a stock car in the Schmidt's 200 Stock Car Race at the Reading Fairgrounds, Reading, Pennsylvania. During the fifteen years that Mr. Grbac had been racing stock cars, he raced at the Reading Fairgrounds on at least twenty-nine occasions. Each time that he participated in a race at the Reading Fairgrounds, he signed a "Release and Waiver of Liability and Indemnity Agreement." *See* Supplement To Defendants' Motion For Summary Judgment.

Following Mr. Grbac's death, his wife, June Grbac, filed a wrongful death and survival action against the Reading Fair Company, Inc., the Fair Investment Company, Inc., Reading Stock Cars, Inc., the Reading Stock Car Racing Association, and Lindy Vicari. Mr. Vicari was the sole owner and president of Fair Investment Company, Inc. and Reading Stock Cars, Inc. at the time of the accident that resulted in Mr. Grbac's death. The complaint alleges that the "defendants negligently and carelessly failed to provide warning lights, flags, signals and other safety devices with which to notify other persons driving in the race to slow down as they approached the location of" the decedent's disabled stock car, or in the alternative, that "such warning lights, flags, signals or other safety devices as were provided by the defendants were either not operational or were not adequate to provide the necessary warnings." The complaint further alleges that the "defendants negligently and carelessly failed to warn or advise plaintiff's decedent and the other drivers participating in said race of the lack of warning lights, flags, signals or other safety devices which were operational and adequate to provide the necessary warning of danger ahead."

The defendants have filed a motion for summary judgment on the grounds that the plaintiff's decedent voluntarily executed a

"Release and Waiver of Liability and Indemnity Agreement" and that the plaintiff's decedent voluntarily assumed the risk of participating in the Schmidt's 200. Pursuant to Federal Rule of Civil Procedure 56(c), a federal court will grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." When considering a motion for summary judgment, a court must view the facts in the light most favorable to the non-moving party. *See Goclowski v. Penn Central Transportation Company,* 571 F.2d 747, 751 (3d Cir. 1977); *Smith v. Pittsburgh Gage and Supply Company,* 464 F.2d 870, 874 (3d Cir. 1972). The movant has the burden of establishing that no genuine issue of fact exists. *See Scooper Dooper, Inc. v. Kraftco Corp.,* 494 F.2d 840, 848 (3d Cir. 1974). With these principles in mind, we find that no genuine issue of material fact exists and that the defendants are entitled to a judgment as a matter of law on the ground that the plaintiff's decedent voluntarily executed a valid "Release and Waiver of Liability and Indemnity Agreement."

The document that Mr. Grbac signed on October 29, 1978 reads as follows:

TRACK Reading, Pa. DATE 10–29–78

RELEASE AND WAIVER OF LIABILITY AND INDEMINITY [sic] AGREEMENT.

IN CONSIDERATION of being permitted to enter for any purpose the RESTRICTED AREA (herein defined as the area to which admission for the general public is prohibited, including but not limited to the pit areas, racing surface and infield, including walkways, concessions and other appurtenances therein) each of the Undersigned, for himself and personal representatives, assigns, heirs and next of kin:

1. HEREBY RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE THE Promoters, Racing Association, Track Operator, Track Owner, Landowner, Possessors Lessors, and each of them their officers, and employees, all for purposes herein referred to as RELEASEES, from all liability to the Undersigned, his personal representatives, assigns, heirs and next of kin for all loss or damages, and any claim or demands therefor, on account of injury to the person or property or resulting in death of the Undersigned, whether caused by the negligence of Releasees or otherwise while Undersigned is upon the Restricted Area; and

2. HEREBY AGREES TO INDEMNIFY AND SAVE AND HOLD HARMLESS THE Releasees and each of them from any loss, liability, damage or cost they may incur due to the presence of the leasees or otherwise.

Each of the Undersigned expressly agrees that the foregoing Release, Waiver and Indemnity agreement is intended to be as broad and inclusive as is permitted by the law of the state in which the race is conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full legal force and effect.

Each of the Undersigned warrants the following statements are true and correct and understands that the Releasees have relied on them in entering into the foregoing Release, Waiver and Indemnity Agreement and in giving the Undersigned permission to enter the Restricted Area:

1. No oral representations, statements or inducements apart from the foregoing written agreement have been made.

2. He is twenty-one or more years of age.

3. He assumes full responsibility and risk of bodily injury, death or property damage due to negligence of Releasees or otherwise upon entering the Restricted Area.

4. If a driver, he has a valid driver's license from the state of his residence.

5. HE HAS READ AND VOLUNTARILY SIGNS THE RELEASE AND

WAIVER OF ALL LIABILITY AND INDEMNITY AGREEMENT.

We must determine the validity and the enforceability of this document under the law of the Commonwealth of Pennsylvania because our jurisdiction over the subject matter of this case rests on diversity of citizenship. *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

The most recent Pennsylvania decision that examined the validity and the enforceability of a release from liability for personal injury was *Zimmer v. Mitchell and Ness*, 253 Pa.Super. 474, 385 A.2d 437 (1978), *aff'd per curiam*, 490 Pa. 428, 416 A.2d 1010 (1980). The plaintiff in *Mitchell and Ness* alleged claims of negligence, breach of warranty and strict liability in tort against a ski rental shop for injuries that he sustained when the bindings on his rented skis failed to release after he fell on the beginners' slope. At the time that the plaintiff rented the skis, he signed a document entitled "Rental Agreement And Receipt." This document read in pertinent part:

> "I understand that so-called safety bindings furnished herewith are releasable bindings designed to reduce the risk or degree of injuries from falling and that these bindings will not release under ALL circumstances and are no guarantee of my safety.
>
> I furthermore release Mitchell and Ness from any liability for damage and injury to myself or to any person or property resulting from the use of this equipment, accepting myself the full responsibility for any and all such damage or injury."

253 Pa.Super. at 477–78, 385 A.2d at 438. The defendant moved for summary judgment on the ground that the signed document constituted a valid release from liability for personal injury. The trial court granted the defendant's motion; the plaintiff appealed.

The Superior Court framed the issue as "whether the agreement is valid and enforceable such that appellee is not legally liable for injuries suffered by appellant." *Id.* at 478, 385 A.2d at 438–39. Acknowledging that the law does not favor exculpatory clauses, the court stated that it would construe the document strictly and resolve any ambiguities against the ski rental shop. The court used a four-part test to determine the validity of the exculpatory clause: (1) the contract must not violate any policy of the law; (2) the contract must be between individuals and relate to their private affairs; (3) each party must be a free bargaining agent rather than one drawn into a contract of adhesion; and (4) the agreement must express the intent of the parties with the utmost particularity. *Id.*, 385 A.2d at 439.

Applying the four-part test to the facts of the case before it, the Superior Court quickly concluded that the ski rental agreement did not violate any policy of the law, that the agreement related to the private affairs of individuals and that the case did not involve a contract of adhesion because the plaintiff voluntarily chose to ski for recreation. The fourth part of the test, however, raised a more difficult issue. The plaintiff argued that the terms of the agreement lacked sufficient particularity, and therefore, that the agreement failed to advise him adequately that he was signing a release from liability for personal injury. In support of his position, the plaintiff noted that the word "negligence" did not appear in the document and that the title of the document—"Rental Agreement And Receipt"—did not reasonably suggest to the reader that the document contained an exculpatory clause. The Superior Court rejected the plaintiff's argument, stating that it had to consider the agreement as a whole. Relying on the language in the document that provided that "bindings will not release under ALL circumstances and are no guarantee of my safety" and that "I . . . release Mitchell and Ness from any liability for damage and injury to myself . . ., accepting myself the full responsibility for any and all such damage or injury," the court concluded that the rental agreement did express clearly the intent of the parties to release the ski rental shop from all liability for personal injury. *Id.* at 478–79, 385 A.2d at 439.

During the course of its discussion, the Superior Court raised, and disposed of, the argument that the agreement was not enforceable because the negligence of the ski rental shop may have occurred prior to the time when the plaintiff signed the agreement. The court assumed that the plaintiff could prove that the defendant had negligently failed to inspect and test the equipment, but it determined that under those circumstances the breach of the legal duty owed to the plaintiff occurred when the two parties entered into the agreement. *Id.* at 480, 385 A.2d at 440.

Given that the Supreme Court of Pennsylvania held that the release was valid and enforceable in *Zimmer v. Mitchell and Ness*, 490 Pa. 428, 416 A.2d 1010 (1980), we must conclude that the release that Mr. Grbac signed on October 29, 1978 is *a fortiori* valid and enforceable. We resolve each element of the four-part test in favor of the defendants.

■ First, just as an exculpatory clause in a ski rental agreement does not violate public policy, a release in an agreement concerning participation in an automobile race does not contravene any policy of the law. Such a release has very little, if any, negative impact on the general population. Moreover, fewer promoters would be willing to hold automobile races if courts refused to permit them to limit their exposure to liability for racetrack accidents, in what is undeniably a dangerous sport. Second, this case does not involve a utility or other quasi-public entity that supplies essential services. Rather, the agreement unquestionably relates to the private affairs of individuals. Third, Mr. Grbac participated in automobile races as a form of recreation. His livelihood did not depend on racing, and he was under no compulsion to enter the Schmidt's 200. Finally, the document that Mr. Grbac signed specifically expresses the intent of the parties to release the defendants from any liability for personal injury. The document is entitled "Release And Waiver Of Liability And Indemnity Agreement." It states that the undersigned agrees to release the defendants from "all liability" for "all loss or damage . . . on account of injury to the person . . . whether caused by the negligence of Releasees or otherwise." The word "negligence" appears three times in the document.

We find additional support for our conclusion that the present release is valid in the many decisions in other jurisdictions that have enforced similar releases in cases involving automobile racing. *See, e. g., Gore v. Tri-County Raceway, Inc.*, 407 F.Supp. 489 (M.D.Ala.1974); *Winterstein v. Wilcom*, 16 Md.App. 130, 293 A.2d 821 (1972); *Tope v. Waterford Racing Corp.*, 81 Mich.App. 591, 265 N.W.2d 761 (1978); *Solodar v. Watkins Glen Grand Prix Corp.*, 36 A.D.2d 552, 317 N.Y.S.2d 228 (1971).

The plaintiff argues that, even if a release from liability for personal injury executed by a participant in an automobile race usually would be valid and enforceable, the release in this case is not enforceable for two reasons. First, she alleges that the defendants did not give consideration in return for Mr. Grbac's execution of the release. This contention relies on the following analysis. On October 10, 1978, Mr. Grbac mailed an entry form and a ten dollar entry fee for the Schmidt's 200 to the Reading Stock Car Association. On the day of the race, October 29, 1978, Mr. Grbac paid an eight dollar pit fee at a booth that was located at the entrance to the track area near the fourth turn. He then walked around to the side of the booth to a second table and there signed the "Release And Waiver Of Liability And Indemnity Agreement." Based on these facts, the plaintiff concludes that Mr. Grbac had a legal right to participate in the race after he paid his entry fee and his pit fee. Therefore, he did not receive any consideration when he signed the release.

■ We believe that the plaintiff's first contention lacks merit. The defendants would not permit an individual to participate in the Schmidt's 200 unless he paid an entrance fee, paid a pit fee and signed a release. Vincent Vicari, a track official, testified at his deposition that no one was permitted to participate in a race at the Reading Fairgrounds unless he had signed a release. Dep. at 119. No evidence suggests

that Mr. Vicari's statement is incorrect. *See* Skias Dep. at 157. Although the participants satisfied the conditions for racing at three different points in time, they were required to satisfy all three conditions before being permitted to compete in the race. Therefore, we hold that Mr. Grbac received consideration in return for his performance of the three conditions for racing.

The plaintiff's second challenge to the enforceability of the exculpatory clause rests on the proposition that the contract released the defendants from liability only for acts of negligence that they committed during the time that the signatories were in the track area and did not release the defendants from liability for acts of negligence that the defendants committed prior to the time when the signatories executed the release. Under the plaintiff's theory, the release would not shield the defendants from the plaintiff's allegations of negligent failure to install adequate warning lights on the track and negligent failure to warn prospective participants that the track lacked adequate safety devices.

■ We can find no basis in the "Release And Waiver Of Liability And Indemnity Agreement" for making a distinction between negligence that occurred before the execution of the release and negligence that occurred after the execution of the release. The relevant portion of the document that Mr. Grbac signed reads as follows:

> [E]ach of the Undersigned, for himself and personal representatives, assigns, heirs and next of kin . . . HEREBY RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE THE Promoters, Racing Association, Track Operator, Track Owner, Landowner, Possessors Lessors, and each of them . . . from all liability to the Undersigned, his personal representatives, assigns, heirs and next of kin for all loss or damage, and any claim or demands therefor, on account of injury to the person or property or resulting in death of the Undersigned, whether caused by the negligence of Releasees or otherwise while Undersigned is upon the Restricted Area . . . .

Thus, Mr. Grbac released the defendants from "all liability" for "all loss or damage." The sole time limitation contained in the quoted language focuses on the time when the signatory incurs the injury rather than on the time when the releasees commit the negligent act. The release applies only to injuries that the signatory incurs "while Undersigned is upon the Restricted Area." For example, if a vehicle owned by the Reading Fair Company negligently struck a signatory's vehicle on a public street when the signatory was going home after the race, the release would not protect the Reading Fair Company from liability. Mr. Grbac suffered his fatal injuries while he was "upon the Restricted Area." Therefore, the release shields the defendants from liability. Moreover, as did the Superior Court in *Mitchell and Ness*, we find that any breach of a duty owed to the plaintiff occurred when the plaintiff and the defendants executed the contract.

Having concluded that neither of the plaintiff's contentions has merit, we hold that Mr. Grbac executed a valid and enforceable agreement that released the defendants from all liability for any injuries sustained by him that resulted from their negligence. All of the claims contained in the plaintiff's complaint rest on a negligence theory. Therefore, the defendants are entitled to judgment as a matter of law on all of the plaintiff's claims.

In a brief that the plaintiff submitted on June 24, 1981, she requested "that final decision on defendants' Motion for Summary Judgment be withheld until such time as the pleadings can be amended to include a cause of action for gross negligence." Brief in Opposition to Defendants' Motion for Summary Judgment, at 11. To date, however, this Court has not received a motion to amend the complaint. We will not delay further the issuance of this memorandum opinion because, in any case, such an amendment would not be in the interests of justice.

■ Federal Rule of Civil Procedure 15(a) provides in part that

[a] party may amend his pleading once as a matter of course at any time before a responsive pleading is served .... Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

The plaintiff filed this action approximately one and a half years ago. The underlying facts are neither complex nor difficult to uncover. During the past nineteen months, the plaintiff has had ample opportunity to conduct discovery and, in fact, has done so. At no time has the plaintiff moved to amend her complaint. If we were to permit the plaintiff to shift the basis of the case from a theory of negligence to a theory of gross negligence at this late date, we would be forcing the defendants to undergo a second round of pleading and discovery. There is no justification in the record to require putting the defendants through such expense at this stage of the case.

Moreover, we do not understand how the plaintiff can expect to succeed on a claim of gross negligence. Chief Judge Lord of the Eastern District of Pennsylvania recently wrote that

> [t]here is no universally accepted definition of gross negligence. As a general rule courts view it as a want of even scant care, but something less than intentional indifference to consequences of acts. In a recent Pennsylvania case that did not involve a commercial contract such as in this case, gross negligence was defined as "a failure to perform a duty in reckless disregard of the consequences or with such want of care and regard for the consequences as to justify a presumption of willfulness or wantonness." *Williams v. State Civil Service Comm'n*, 9 Pa. Cmwlth. 437, 306 A.2d 419, 422 (1973), *aff'd*, 457 Pa. 470, 327 A.2d 70 (1974).

*Fidelity Leasing Corp. v. Dun & Bradstreet, Inc.*, 494 F.Supp. 786, 790 (E.D.Pa.1980) (footnotes omitted). *Accord*, W. Prosser, *Handbook of the Law of Torts* § 34, at 183–84 (4th ed. 1971). Thus, in order to recover on a gross negligence claim, the plaintiff would have to prove that the defendants acted in an *extremely* careless manner or failed to perform a duty in *reckless disregard* of the consequences.

Despite all of the discovery that has occurred in this case, the plaintiff has suggested only one alleged failure by the defendants that she believes might constitute gross negligence. This alleged failure involved the activities of one of the racetrack's flagmen.

The defendants had assigned a flagman to the starter's stand, which protrudes over the track surface along the grandstand straightaway. This flagman had the duty of displaying the appropriate flags to the drivers during the race. A green flag signifies racing conditions. A yellow flag directs the drivers to reduce speed, exercise caution and hold their respective positions. A red flag directs the drivers to stop their vehicles.

During the ninety-eighth lap of the Schmidt's 200, Mr. Grbac's stock car collided with another stock car on the grandstand straightaway and flipped over onto its roof. Within seconds, a stock car driven by Chris Skias rammed into Mr. Grbac's disabled vehicle. At the time of the initial collision, the flagman threw himself to the floor of the starter's stand. He remained prone for a very brief period, then stood up and displayed the yellow flag just before the Skias vehicle hit the Grbac vehicle. At oral argument on the motion for summary judgment, plaintiff's counsel asserted that the flagman acted in unjustifiable fear of being struck, and that his delay in displaying the yellow flag may have deprived Mr. Skias of the opportunity to reduce his speed and to avoid Mr. Grbac's vehicle.

Although unresolved factual questions would prevent us from ruling on the causation issue at the summary judgment stage, we would be prepared to hold as a matter of law that the flagman was not grossly negligent when he reacted to the initial accident by throwing himself to the floor. The accident occurred on the grandstand straightaway just before the starter's stand. Skias Dep. at 166–68. Although no vehicle could strike the starter's stand, which is elevated over the racing surface,

parts that may become dislodged from a gyrating vehicle could strike the stand. Therefore, the flagman acted in response to a reasonable concern for his safety when he protected himself from possible flying debris; his action certainly did not constitute gross negligence. *Cf. Peterson v. Baltimore & Ohio Railroad Co.*, 73 F.Supp. 597 (1947) (sudden emergency rule provides that person in position of danger through no fault of his own cannot be charged with negligence if he omits to perform a duty that arises suddenly and unexpectedly).

Not only do we find that the plaintiff's one possible allegation of gross negligence is completely inconsistent with the undisputed facts and the settled law, but we also are unable to identify any other possible act or omission of the defendants that may have contributed to the decedent's death and that may be characterized as grossly negligent. The plaintiff contends that the proximate cause of Mr. Grbac's death was the failure to warn Mr. Skias of the initial collision. The events that resulted in Mr. Grbac's death, however, occurred suddenly and ran their course within the space of a few seconds. We already have found as a matter of law that any delay on the part of the flagman in displaying the yellow flag did not constitute gross negligence. Race officials also communicated with the drivers through a network of corner lights and stringer lights, which provide the same information to the drivers that the flagman provides. Mr. Vicari and Mr. Skias testified at their depositions that these lights were functioning prior to the accident. Vicari Dep. at 102; Skias Dep. at 160–61. Mr. Skias also testified that after he exited his disabled stock car he noticed that the stringer lights were red. Dep. at 178. Thus, the undisputed evidence establishes that the lights were functioning at the time of the accident. The unresolved factual questions are whether or not there was a delay in turning the lights to yellow and whether or not the delay, if any, contributed to Mr. Skias' inability to avoid Mr. Grbac's disabled vehicle. We could not reach the causation issue at this stage of the case. We would be prepared to hold as a matter of law, however, that any delay in turning the lights to yellow could not have been the result of gross negligence because of the unexpected and rapid nature of the events.

In summary, we hold that the plaintiff's negligence claims are barred because Mr. Grbac executed a valid and enforceable "Release And Waiver Of Liability And Indemnity Agreement." Moreover, we would not permit the plaintiff to amend her complaint to add a gross negligence claim because such an amendment would be untimely, futile and frivolous.

An appropriate order will be entered.