Robert L. PLANT *v.* Gary WILBUR and
Linda Wilbur *d/b/a* Northwest Arkansas Speedway

00–1116 47 S.W.3d 889

Supreme Court of Arkansas
Opinion delivered July 9, 2001

*Mashburn & Taylor,* by: *Timothy L. Brooks,* for appellant.

*Kemp, Duckett, Spradley, Curry & Arnold,* by: *James M. Duckett,* for appellees.

DONALD L. CORBIN, Justice. Appellant Robert L. Plant was injured by some flying debris while watching an auto race at the Northwest Arkansas Speedway. Plant sued Appellees Gary and Linda Wilbur, the owners and operators of the Speedway, alleging that his injuries resulted from their negligence. Appellees countered that Plant had signed an agreement releasing the Speedway from any liability, and therefore he could not maintain a cause of action against them. Appellees filed a motion for summary judgment based on the existence of the release, and the Benton County Circuit Court granted the motion, finding that the release was enforceable under Arkansas law. For reversal, Plant argues that the release is void as against public policy and, thus, the trial court erred in granting summary judgment. As this appeal presents an issue of first impression, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1–2(b)(1). We affirm.

The record reveals that the Speedway is an oval–shaped dirt track located in Pea Ridge, that has been in operation since 1992. Plant was a member of a pit crew for one of the drivers who raced at the Speedway. He testified during his deposition that he believed that he had been frequenting the track since it opened, and that he believed that he had signed the release on at least twelve occasions prior to the day his accident occurred. On the night of the accident, Plant paid $15 in order to gain admission to an area of the racetrack, known as the pit.[1] Before entering the pit area, Plant signed a document entitled "Release and Waiver of Liability and Indemnity Agreement," as was required of anyone who wanted to enter the pit area. The release, which contains twelve signature lines, was prepared by North American Racing Insurance, Inc., and

---

[1] The admission price to the pit area was more expensive than the $6 admission price for entrance to the grandstand.

is commonly used at racetracks across the country. The release provides as follows:

> IN CONSIDERATION of being permitted to enter for any purpose any RESTRICTED AREA (herein defined as including but not limited to the racing surface, pit areas, infield, burn out area, approach area, shut down area, and all walkways, concessions and other areas appurtenant to any area where any activity related to the event shall take place), or being permitted to compete, officiate, observe, work for, or for any purpose participate in any way in the event, EACH OF THE UNDERSIGNED, for himself, his personal representatives, heirs, and next of kin, acknowledges, agrees and represents that he has, or will immediately upon entering any of such restricted areas, and will continuously thereafter, inspect such restricted areas and all portions thereof which he enters and with which he comes in contact, and he does further warrant that his entry upon such restricted area or areas and his participation, if any, in the event constitutes an acknowledgment that he has inspected such restricted area and that he finds and accepts the same as being safe and reasonably suited for the purposes of his use, and he further agrees and warrants that if, at any time, he is in or about restricted areas and he feels anything to be unsafe, he will immediately advise the officials of such and will leave the restricted areas:
>
> 1. HEREBY RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE the promoter, participants, racing association, sanctioning organization or any subdivision thereof, track operator, track owner, officials, car owners, drivers, pit crews, any persons in any restricted area, promoters, sponsors, advertisers, owners and lessees of premises used to conduct the event and each of them, their officers and employees, all for the purposes herein referred to as "releasees", from all liability to the undersigned, his personal representatives, assigns, heirs, and next of kin for any and all loss or damage, and any claim or demands therefor on account of injury to the person or property or resulting in death of the undersigned, whether caused by the negligence of the releasees or otherwise while the undersigned is in or upon the restricted area, and/or, competing, officiating in, observing, working for, or for any purpose participating in the event.
>
> 2. HEREBY AGREES TO INDEMNIFY AND SAVE AND HOLD HARMLESS the releasees and each of them from any loss, liability, damage, or cost they may incur due to the presence of the undersigned in or upon the restricted area or in any

way competing, officiating, observing, or working for, or for any purpose participating in the event and whether caused by the negligence of the releasees or otherwise.

3. HEREBY ASSUMES FULL RESPONSIBILITY FOR AND RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE due to the negligence of releasees or otherwise while in or upon the restricted area and/or while competing, officiating, observing, or working for or for any purpose participating in the event.

4. EACH OF THE UNDERSIGNED expressly acknowledges and agrees that the activities of the event are very dangerous and involve the risk of serious injury and/or death and/or property damage. EACH OF THE UNDERSIGNED further expressly agrees that the foregoing release, waiver, and indemnity agreement is intended to be as broad and inclusive as is permitted by the law of the Province or State in which the event is conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full legal force and effect.

5. THE UNDERSIGNED HAS READ AND VOLUNTARILY SIGNS THE RELEASE AND WAIVER OF LIABILITY AND INDEMNITY AGREEMENT, and further agrees that no oral representations, statements or inducements apart from the foregoing written agreement have been made.

Sheldon England, an employee of North American, testified that this release is known as "participant legal coverage," and is required where a racetrack allows people into restricted areas, such as the pit area, because of the dangerous activities that take place in these areas.

On the evening of his accident, Plant was standing on a track compactor, located near the spot where the cars exit the track. While standing there, Plant was struck by a wheel and tire that became dislodged from one of the race cars. The wheel and tire went through and over the fencing that separated the track from the pit area. Plant sustained injuries to his neck, left shoulder, and left arm. Plant's left arm was eventually amputated, although it is not clear from the record before this court what led to this amputation or when it occurred. Plant testified in his deposition that the only time he was in the pit area was when his team's car was racing, otherwise he would watch the races from the grandstand area.

Plant filed a complaint against Appellees, alleging that Appellees were negligent in: (1) failing to provide adequate safety barriers between the racetrack and persons admitted into the pit area; (2) failing to properly maintain the existing fence between the racetrack and the pit area; and (3) failing to warn persons admitted to the pit area about dangers related to flying debris from race cars. In his complaint, Plant stated that he had accumulated medical expenses in excess of $45,000, and sought compensatory damages of $1,000,000. Appellees pled the affirmative defenses of waiver and release in response to the complaint, and also stated that they had paid $10,000 to Springdale Memorial Hospital in partial payment of Plant's medical bills.

Appellees, in turn, filed a motion for summary judgment, asserting that Plant could not maintain a cause of action against them because he had signed the release. Initially, the trial court denied the motion, but the trial court later granted Appellees' motion for reconsideration and conducted a hearing on the summary-judgment motion. During that hearing, the trial court ruled from the bench that the release was valid, and therefore, summary judgment was proper in this case. From that order, comes the instant appeal.

 The appropriate standard of review to be employed when reviewing a grant of summary judgment was set forth by this court in *Worth v. City of Rogers*, 341 Ark. 12, 14 S.W.3d 471 (2000):

> We have repeatedly held that summary judgment is to be granted by a trial court only when it is clear that there are no genuine issues of material fact to be litigated, and the party is entitled to judgment as a matter of law. *George v. Jefferson Hosp. Ass'n, Inc.*, 337 Ark. 206, 987 S.W.2d 710 (1999); *Pugh v. Griggs*, 327 Ark. 577, 940 S.W.2d 445 (1997). Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Id.* On appellate review, we determine if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of its motion leave a material fact unanswered. *Id.* This court views the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Adams v. Arthur*, 333 Ark. 53, 969 S.W.2d 598 (1998); *Pugh*, 327 Ark. 577, 940 S.W.2d 445. Our review is not limited to the pleadings, as we also focus on the affidavits and other documents filed by the parties. *Wallace v. Boyles*, 331 Ark. 58, 961

S.W.2d 712 (1998); *Angle v. Alexander*, 328 Ark. 714, 945 S.W.2d 933 (1997). After reviewing undisputed facts, summary judgment should be denied if, under the evidence, reasonable men might reach different conclusions from those undisputed facts. *George*, 337 Ark. 206, 987 S.W.2d 710.

*Id.* at 20, 14 S.W.3d at 475.

For reversal, Plant asserts that the trial court erred in granting summary judgment because the release he signed is void and has no effect under Arkansas law. Specifically, he contends that the release is an exculpatory contract, and our court has stated that such contracts are not favored under the law. Appellees counter that this is an issue of first impression, as no Arkansas court has considered and ruled upon the validity of exculpatory agreements involving dangerous recreational activities, such as auto racing.

It is true that this court has long stated a strong disfavor for exculpatory contracts that exempt a party from liability, because of the public-policy concern encouraging the exercise of care. *See Farmers Bank v. Perry*, 301 Ark. 547, 787 S.W.2d 645 (1990); *Middleton & Sons v. Frozen Food Lockers*, 251 Ark. 745, 474 S.W.2d 895 (1972); *Arkansas Power & Light Co. v. Kerr*, 204 Ark. 238, 161 S.W.2d 403 (1942). This court has further stated that exculpatory contracts are to be strictly construed against the party relying on them. *Farmers Bank*, 301 Ark. 547, 787 S.W.2d 645.

While this court disfavors exculpatory contracts, it has never ruled that such contracts are invalid *per se.* "When construing such release contracts, this court has said that it is not impossible to avoid liability for negligence through contract; however, to avoid such liability, the contract must at least clearly set out what negligent liability is to be avoided." *Farmers Bank*, 301 Ark. at 550-51, 787 S.W.2d at 646-47 (citing *Middleton & Sons*, 251 Ark. 745, 474 S.W.2d 895). Moreover, this court has never before been presented with a situation where a release was executed in the context of a dangerous recreational activity.

We are persuaded by the Eighth Circuit Court of Appeals' analysis of this very issue in *Haines v. St. Charles Speedway, Inc.*, 874 F.2d 572 (8th Cir. 1989). There, the court of appeals stated that a release, containing language identical to the release at issue here, signed by the appellant prior to his entering the restricted infield

area constituted an adhesion contract. The court of appeals, however, analyzed the validity of the contract under a "total transaction" approach, as opposed to simply reviewing the literal language of the release, in order to determine the intent of the parties. *Id.* at 575. In holding that the release was valid, the court of appeals found it significant that the appellant had been involved in the sport of racing for quite some time, and that he admitted to being aware of the dangerous nature of this activity, both for participants and spectators. Finally, the court noted that the lower court correctly considered the circumstances surrounding the execution of the release and properly found that while the appellant was functionally illiterate, he had the responsibility of finding out what the contract said.

We are also mindful that numerous jurisdictions have found that releases containing similar, and sometimes identical language to this one, are not void as against public policy. The general rationale behind allowing these types of releases in the context of auto racing is that they involve a very narrow segment of the public, rather than situations involving a public utility, a common carrier, or a similar entity connected with the public interest. *See Dunn v. Paducah Int'l Raceway*, 599 F. Supp. 612 (W.D. Ky. 1984); *Rhea v. Horn-Keen Corp.*, 582 F. Supp. 687 (W.D. Va. 1984); *Grbac v. Reading Fair Co., Inc.*, 521 F. Supp. 1351 (W.D. Pa. 1981).

An additional reason stated by some jurisdictions in affirming the validity of these releases is that situations involving auto racing are ones where the parties have equal bargaining power. In *LaFrenz v. Lake County Fair Bd.*, 360 N.E.2d 605 (Ind. Ct. App. 1977), the Indiana Appeals Court found that a release signed by a racing participant was valid in light of the relationship between the parties. "The decedent was under no compulsion, economic or otherwise, to be in the restricted pit area." *Id.* at 395. *See also Dunn*, 599 F. Supp. 612. Finally, some courts have expressed a concern that if they disallow releases, fewer promoters would be willing to sponsor auto races because of the unlimited liability they may face. *Grbac*, 521 F. Supp. 1351; *Gore v. Tri-County Raceway, Inc.*, 407 F. Supp. 489 (M.D. Ala. 1974).

Keeping these factors in mind, we now turn to the release executed by Plant and the circumstances surrounding that execution. Plant was a regular participant in auto races and admitted to having frequented the Speedway. He also stated that he had signed the exact same release form on at least twelve prior occasions. Plant has made no allegations that he was forced to sign the release, and

he admitted that he never asked any questions regarding the contents of the document he was signing. Moreover, Plant was familiar with the pit area and its proximity to the racetrack. He stated that he was only in the pit area when his team's car was racing, and that when he was there as a mere spectator, he stayed in the grandstand area. More importantly, as a participant, Plant was certainly familiar with the dangers inherent in the sport of auto racing. In fact, he admitted to having witnessed numerous wrecks that occurred during racing events. With this knowledge, Plant continued to voluntarily participate in this activity.

As for the release itself, it contained certain key phrases in bold, such as "releases," "discharges," and, "covenants not to sue," that should have put Plant on notice about the import of what he was signing. We also disagree with Plant's assertions that the release was overly vague. It specifically references releasing the Speedway of claims for "negligence" in three different passages. It also states that the pit area is a restricted area to which the release applies.

In granting the Appellees' motion for summary judgment, the trial court took into consideration the circumstances surrounding the execution of the release and stated:

> I don't find an unequal bargaining position type of argument sustained by the record before me. . . . I don't find that this is the type of enterprise in which the courts have acknowledged that it is improper to let them, — in other words, an enterprise that people have to rely upon like public transportation or other types of enterprises where people of necessity have to go just to get through life and conduct regular business activities, making a living. This is nothing but a — this is, this is recreation, dangerous recreation, exciting recreation, but it's recreation. And, I certainly don't find a compelling reason for this Court to start drawing up public policy. I just don't think that it's called for here. I don't think it has been established as something that the Arkansas courts would clearly see as against public policy, and, uh, so I am going to reverse my earlier opinion and grant summary judgment.

■ Considering the facts and circumstances surrounding the execution of the release by Plant, we agree with the trial court that this release was valid, and therefore, summary judgment was appropriate. Accordingly, we affirm the order of the trial court.

■ We note that Plant also argues that the release is not enforceable because it was not the result of a mutual agreement, nor

supported by sufficient consideration. Specifically, Plant contends that neither Appellees, nor himself, understood the meaning of the release. The abstract before us does not reveal, however, that this argument was raised at the trial court level. It is well settled that where the abstract does not reflect that the argument, or any similar argument, was made in the trial court, we will not reach the merits of the argument on appeal. *Barber v. Watson*, 330 Ark. 250, 953 S.W.2d 579 (1997); *Betts v. Betts*, 326 Ark. 544, 932 S.W.2d 336 (1996). Nor will we turn to the record to decide such an issue. *Reeves v. Hinkle*, 326 Ark. 724, 934 S.W.2d 216 (1996). This court will not be placed in a position of deciding an issue for the first time on appeal. *Id*. Accordingly, we decline to address Plant's argument on this point.

Affirmed.

GLAZE and IMBER, JJ., dissent.

TOM GLAZE, Justice, dissenting. In reaching its decision, the majority opinion relies on the Eighth Circuit Court of Appeals case, *Haines v. St. Charles Speedway, Inc.*, 874 F.2d 572 (8th Cir. 1989). The Haineses brought action against the promoter of an automobile race and a racetrack owner to recover damages for injuries sustained when Mr. Haines, the race car owner, was struck by his own car while attempting to have it started. The Haineses sought to defeat a summary judgment order primarily by arguing that, under controlling Missouri law, the release and waiver constituted a contract of adhesion.[1] The federal court agreed that the release was a contract of adhesion, but determined the release was unambiguous, not overbroad, and the facts surrounding the case were essentially undisputed. In so finding, the *Haines* court held it must apply a "total transaction" analysis in determining the intent of the parties to an exculpatory agreement.

The *Haines* case is far different from the one now before our court. First, as expressed in *Haines*, the federal court looked to Missouri law to decide that case, and in doing so, pointed out that, under Missouri law, an agreement to exempt one from the consequence of negligence is not against public policy. To the contrary, our court has very clearly decided that agreements exculpating parties from liability for their own negligence is against Arkansas's

---

[1] Missouri law defined a contract of adhesion as a form of contract submitted by one party and accepted by the other on the basis of *this* or *nothing*. *Id*.

strong public policy. *Farmers Bank v. Perry*, 301 Ark. 547, 787 S.W.2d 645 (1990). Rather than adopting another state's law on adhesion contracts in reviewing this case, our court would be better served by adhering to its own well-settled law on the review of orders granting summary judgment, and the analysis of exculpatory agreements set out in *Perry*.

Second, I would further add that, unlike in *Haines*, the instant case involves disputed material facts that need to be tried. In *Wallace v. Broyles*, 332 Ark. 189, 961 S.W.2d 712 (1998), this court held that "we only approve the granting of the [summary judgment] motion when the state of the evidence as portrayed by the pleadings, affidavits, discovery responses, and admission on file is such that the nonmoving party is not entitled to a day in court, *i.e.*, when there is not any genuine remaining issue of fact and the moving party is entitled to judgment as a matter of law." Unlike the federal courts' interpretation of Fed. R. Civ. P. 56, under our rule the court will not engage in a "sufficiency of the evidence" determination. *Id.* The object of summary-judgment proceedings is not to try the issues, but to determine if there are any issues to be tried, and if there is any doubt whatsoever, the motion should be denied. *Id.* (quoting *Thomas v. Sessions*, 307 Ark. 203, 818 S.W.2d 940 (1991)). Viewing the evidence here in a light most favorable to Mr. Plant, the party against whom the motion was filed, and resolving all doubts and inferences against the Wilburs, the evidentiary items presented by the Wilburs in support of their motion leave questions of material fact unanswered.

Here, factual disputes remain concerning several material issues: (1) whether the disclosure of the types of negligence addressed in the waiver and release form were clear and specific enough to render a valid exculpatory agreement; (2) whether Mr. Plant was a spectator or a participant in the race at the time of his injury and how that might affect the exculpatory agreement; (3) whether Plant was injured while he was in a "restricted area," covered by the terms of the agreement; and (4) whether Plant knowingly waived all right to hold the Wilburs liable for the specific negligent acts that he alleged in his complaint.

As the majority notes, this court has stated that it is not impossible to avoid liability for negligence through contract if the exculpatory agreement clearly and specifically sets out exactly what negligent acts are covered. *Perry*, 301 Ark. at 550-51, 787 S.W.2d at 646-47 (citing *Middleton & Sons v. Frozen Food Lockers*, 251 Ark.

745, 474 S.W.2d 895 (1972)). Such contracts are strictly construed against the party relying on them. *Id.*

First, I note here that the generic waiver and release form signed by Plant does not specify the types of negligence that it covers. Plant alleged that the Wilburs failed to provide and maintain adequate safety barriers, and failed to warn of the dangers of flying debris. Plant's expert testified that the safety barriers between the track and the pit area, specifically the "wheel fence," had been improperly constructed and that the Wilburs had failed to construct any barrier to keep the spectators away from the wheel fence. The case should be remanded so that a fact-finder may determine whether the agreement clearly set out what negligent liability was to be avoided. *See Middleton & Sons v. Frozen Food Lockers*, 251 Ark. 745, 474 S.W.2d 895 (1972) (citing *Arkansas Power & Light Co. v. Kerr*, 204 Ark. 238, 161 S.W.2d 403 (1942)).

Secondly, I point out that a fact question exists as to whether Mr. Plant was a spectator or a participant member of the race crew at the time he was injured. As the majority notes, Sheldon England, the insurance broker, testified that the release applied to *"participant* legal coverage." Plant testified that he was admitted as a member of the race crew; however, he was admitted by paying the same entry fee and signing the same release form as an ordinary spectator. Plant's testimony reflected that at the time he was injured he was not working as a crew member, but instead was watching the race with other spectators in an area away from the pit area where his race crew was located. In sum, a genuine issue remains as to whether Plant was a spectator or a participant, and whether the exculpatory agreement applied the same, to spectators as it did to participants, or not at all. *See, e.g., Eder v. Lake Geneva Raceway*, 523 N.W.2d 429 (Wis. Ct. App. 1994).

Thirdly, I submit that it is equally unclear whether the area in which Plant was located, when injured, qualified as a "restricted area" under the terms of the exculpatory agreement. *See, e.g., Arnold v. Shawano County*, 317 N.W.2d 161 (Wis. Ct. App. 1982) *overruled on other grounds by Green Spring Farms v. Kersten*, 401 N.W.2d 816 (Wis. 1987); *Eder v. Lake Geneva Raceway*, 523 N.W.2d 429 (Wis. Ct. App. 1994). Although the Wilburs and the trial court presumed that Plant was observing the race from the pit area because that is where he had entered the race track, Plant's deposition reflects, and the Wilburs fail to dispute, that Plant was injured behind a fence near the race course, where he stood with other spectators.

Finally, the record reflects that the broad terms of the exculpatory agreement fail to give a reasonable person signing the release notice that he or she is waiving any right to hold the Wilburs accountable for premises liability. *See, e.g., Yauger v. Skiing Enters., Inc.*, 557 N.W.2d 60 (Wis. Ct. App. 1996) (court must examine whether "overbroad, general terms of exculpatory agreement create ambiguity and uncertainty as to what the signer was releasing"); *see also* AMI Civ. 4th 3012 (Supp. 2000-2001). Here, a disputed factual issue exists as to whether Plant knew or should have known, even upon the inspection required by the release and waiver agreement, that the safety barriers constructed to protect restricted areas were inadequate to prevent the type of injury that he incurred. Similarly, there is a factual issue as to whether Plant was given a reasonable opportunity to read and comprehend that he was signing a complete waiver of liability, especially in light of Plant's undisputed allegations about his signing of the agreement through a truck window while waiting in line for entrance. *See, e.g., Eder v. Lake Geneva Raceway*, 523 N.W.2d 429 (Wis. Ct. App. 1994); *Sexton v. Southwestern Auto Racing Assoc.*, 394 N.E.2d 49 (Ill. App. Ct. 1979).

As noted, this court has never upheld an agreement purporting to release a party from liability for his own negligence before it occurred. *Perry*, 301 Ark. at 550, 787 S.W.2d at 646 (citing *Williams v. U.S.*, 660n F. Supp. 699 (E.D. Ark. 1987)). The rationale behind the numerous decisions invalidating so-called releases given before liability arises is based upon the strong public policy of encouraging the exercising of care. *Id.* Why should we carve out an exception to our rule and public policy disfavoring exculpatory contracts merely because the contractual release covers a dangerous recreational activity? Surely the person charging an admission price to view a car race (or hockey game or wrestling match for that matter) should be held to some duty to use ordinary care for the spectators' safety. We should not, in my opinion, allow parties who promote dangerous sports activities to be effectively immunized from liability when a spectator is injured by a flying wheel (or puck, or folding chair) because the party promoting the dangerous sport failed to afford the spectator, as an invitee, a reasonably safe environment. Although there may be some exception made to allow racing facility proprietors like the Wilburs to place reasonable conditions on the terms of admission, the owners of such facilities should also be charged with taking reasonable steps to insure the safety of the public at such events.

In my view, Mr. Plant is entitled to have a fact-finder resolve the foregoing disputed material issues, and, therefore, I dissent.

IMBER, J., joins this dissent.