Missouri Pacific Railroad Company *v*. Bushey.

·Opinion delivered October 7, 1929.

*N. F. Lamb, Gordon Frierson* and *Thos. B. Pryor,* for appellant.

*Pace & Davis,* for appellee.

HUMPHREYS, J. Appellee, administratrix of the estate of George M. Bushey, deceased, brought this suit under the Federal Employers' Liability Act (45 U. S. C. A. §§ 51-59) against appellant in the circuit court of Poinsett County, to recover damages in the sum of $75,000 for the benefit of herself and minor son, Marion F. Bushey, on account of the injury and death of her husband, a railroad engineer in the employment of appellant at the time, through its alleged negligence in allowing the railroad track, about three and one-half miles north of McGehee, to become so unsafe that it failed to support the locomotive which her intestate was operating in pulling train No. 102, in use in transportation of express and passengers from Louisiana to Arkansas and other States.

Appellant filed an answer, denying the alleged negligence, and attributing the injury and death to the act of a miscreant in disconnecting a rail, and moving the south end thereof toward the center of the track, which caused the derailment of the locomotive, and two of the cars and a coach; and pleading assumed risk on the part of her intestate as an affirmative defense.

The cause was submitted to the jury upon the issues of alleged negligence and assumed risk, with directions as to elements and measure of damages, contingent on liability, which resulted in a verdict and consequent judgment in favor of appellee for $48,500, from which is this appeal.

Appellant contends for a reversal of the judgment upon the alleged ground, that the undisputed testimony reflects that the proximate cause of the injury to appel-

lee's intestate, resulting in his death, was the disconnection of a certain rail, and the removal of the south end thereof about eighteen inches west toward the center of the track, by an unknown miscreant, and that the derailment of the locomotive and said cars and coach did not result from the unsafe condition of the track.

The wreck occurred about midnight of September 13, 1926, some three and one-half miles north of McGehee. Thirty-five minutes before the wreck occurred another train had passed over the track at this point safely, running thirty-five or forty miles an hour. At the time of the wreck the train was traveling north, and after bending a part of the rails and tearing most of the ties literally to pieces for a distance of three hundred feet, the locomotive, detached from the mail and baggage cars and chair coach, and leaving them almost demolished in various positions on the track, was found on the east side of the track, partly east of the right-of-way fence, lying on its left side, emitting hot water and steam, beneath which appellee's intestate was caught and tightly held by his legs for about three hours before they could release him, during which time the hot water and steam blew into his face, and put out his eyes. Immediately after being released he died from the effects of the injuries received. During the entire time he was pinned under the locomotive his suffering was intense. He was conscious, and continually called on those present for help and assistance to get out. The two sleepers or Pullmans at the rear of the train were uninjured, the front wheels of the first one being on the ground and the back wheels on the rails, and the second one standing on the track in a normal position.

The superintendent, roadmaster and other officials and employees came out from McGehee to the scene of the wreck, and, a short time thereafter, set about to ascertain the cause of the wreck. They discovered a detached or disconnected rail under the front Pullman, with the south end thereof moved eighteen inches or more

toward the center of the track, and they, as well as other parties present, testified that the rail was straight, sitting upright, pulled several feet forward, and attached or connected to the bent rail in front of it; that the angle-bars, bolts, washers and taps were lying near and around the place where they had been detached from the rail south or back of it; that the threads on the taps and bolts were bright, and all of them uninjured, indicating, to their minds, that the taps had been unscrewed, and that the bolts, angle-bars and washers had been removed by some person. The spikes had all been removed on the inside of said rail, but not on the outside, with a claw-bar which had left its print on the ties. Tools which would have been used to disconnect the rail and pull the spikes were found hidden between some logs a short distance from the right-of-way. The plates on the seven ties upon which the rail had rested disclosed evidences of wheels having passed over them, but the seven ties themselves were left uninjured. The rails in front or north of these seven ties were bent, and the ties for a distance of three hundred feet were demolished. The east rail immediately in front of the disconnected rail was turned on its side, and had marks upon it, indicating, to the minds of appellee's witnesses, that the locomotive and other cars were derailed at that point. Sand had been sprinkled on three or four rails on the south of the displaced rail, all of which were still in alignment, and in place.

Appellant concedes that the testimony introduced by appellee showed that the track where the rails were bent and ties demolished by the locomotive, two cars and chair coach, was in bad condition. This concession was based upon the testimony of witnesses introduced by appellee, who testified that this portion of the track, as well as the portions thereof for a long distance to the north and south, were out of repair and unsafe on account of rotten ties and loose spikes holding down the rails; that a large number of new ties had been scattered by the side of the track at the point of the wreck and a considerable dis-

tance each way, for the purpose of repairing the track. Appellant argues that, notwithstanding the concession it makes, the testimony does not contradict its testimony to the effect that, before reaching the bent rails and demolished ties, the locomotive, cars and coach between it ran off the rails onto the ties at the place where the rail was disconnected, and moved toward the center of the track, and that this was the cause of the commencement of the wreck, and necessarily the cause of the death of appellee's intestate.

This would be a conclusive argument against liability of appellant if the physical facts testified to by its witnesses were entirely undisputed. The condition found and testified to by them is disputed by physical facts testified to by appellee's witnesses. According to the testimony of the witnesses introduced by appellee, the rail which was turned and bent was immediately in front of the first Pullman. The testimony disputes that of appellant to the effect that it began with the displaced rail. The physical fact that the seven ties under the displaced rail were not demolished by the locomotive, cars and coach, just as the ties were north of the seven ties, also disputes the physical fact that the bolts had been unscrewed and rail moved before the train arrived at that point. It is almost inconceivable that a locomotive of perhaps one hundred tons weight and two cars and a coach could have dropped, while rapidly moving, off of a rail onto the ties, and not have displaced them, when the same locomotive, cars and coach, necessarily with a little less speed, had demolished and displaced the ties and bent the rails immediately north and in front of the seven ties which escaped injury or displacement from such rough treatment. The jury may have reasonably concluded that the physical condition relative to the displaced rail, bolts, washers, angle-bars and taps found and testified to by appellant's witnesses did not exist at the time the locomotive, cars and coach passed over the space occupied by the seven ties. Appellant argues,

however, that it must have existed, because corroborated by its witnesses, who testified that, before reaching that particular point, the emergency brakes were applied and sand dropped on three or four rails just south of the displaced rail. The track was straight at the point where the wreck occurred for a long distance each way. If the condition existed, the jury may have found that the engineer and fireman could have discovered the displaced rail in ample time to have stopped the train before reaching it. The reasonable conclusion is that they would have done so, as it was their duty to keep a lookout, as well as for their own protection to do so. The emergency brakes may have been applied and sand dropped on the rails for other reasons. It may be that they saw something further ahead on the straight track that caused the engineer to do this, or something may have happened to the engine which impelled him to do it.

Again, it is highly improbable that an unknown miscreant would have disconnected the rails for the purpose of wrecking a train, and endangering the lives of a great many people. The record is silent as to the motive on the part of any one for committing such an act. There was therefore a dispute in the testimony as to what caused the wreck, and ample testimony in the record of a substantial nature to support the verdict of the jury, to the effect that the proximate cause of the injury and death of appellee's intestate was the unsafe condition of the track. It cannot be said, in arriving at the verdict, that the jury arbitrarily discarded or rejected the testimony of appellant's witnesses relative to the displacement of the rail by a miscreant. The testimony was weighed, found wanting in reason, and rejected because contradicted by the evidence of a substantial nature tending to establish a reasonable and certain conclusion as to the cause of the wreck. The court did not err in refusing to peremptorily instruct a verdict for appellant in the case.

Appellant also contends for a reversal of the judgment because five of the jurors who tried the case had

not assessed for the payment of a poll tax, although each had paid same, and because all answered upon their *voir dire*, at the commencement of the term, that they were qualified electors of Poinsett County. Under statute as well as the practice in this State, it is too late, after the rendition of a verdict, to raise the ineligibility of a juror to serve, unless it can be shown by the complaining party that diligence was used to ascertain his disqualification, and prevent his selection as a juror. Crawford & Moses' Digest, § 6343; *Casat* v. *State,* 40 Ark. 515; *James* v. *State,* 68 Ark. 464, 60 S. W. 29; *Teel* v. *State,* 129 Ark. 181, 195 S. W. 32; *Doyle* v. *State,* 166 Ark. 505, 266 S. W. 459. In the instant case diligence was not shown. The contention of appellant for a reversal of the judgment upon this ground is without merit.

Appellant also contends for a reversal of the judgment, because the trial court instructed the jury that nine of them could return a verdict. Appellant argues that the amendment to the Constitution authorizing nine jurors to render a verdict in a civil case did not become effective as a part of the Constitution until the favorable vote thereon by the people at the general election held October 6, 1928, was reported to the Speaker of the House in January, 1929, and declared adopted by him. This is the rule applicable to constitutional amendments which do not provide when they shall go into effect, but if the time is fixed in the amendment itself when it shall go into effect, that time controls. The amendment in question stated, that it should be self-executing, and go into effect immediately upon its adoption by the electors of the State. The question raised was raised and decided adversely to appellant's contention herein in the recent case of *Matheny* v. *Independence County,* 169 Ark. 927, 277 S. W. 22. The trial court did not err in instructing the jury that nine members thereof, if agreed, could render a verdict in the case.

Appellant also contends for a reversal of the judgment for the alleged reason that instruction No. 1, given

by the court at the request of appellee, submitted an issue of whether or not appellant had failed or neglected to inspect the track where the wreck occurred, whereas the only issue of negligence alleged, and in the case, was the allegation that appellant had permitted its track to become defective and insufficient, thereby causing the locomotive and cars to be derailed. We do not so interpret the instruction complained of. The purport and effect of the instruction was to tell the jury that they could not return a verdict for appellee unless they found that the track was defective and insufficient, and that appellant either knew of the defective condition of the track, or could have known that fact by making a reasonably careful inspection. The instruction, as we read it, limited the jury to the sole issue of whether the wreck and consequent injury and death resulted on account of the unsound condition of the ties, and rails insecurely fastened thereto. The instruction was a correct declaration of the law applicable to the facts, and no error was committed in giving it to the jury.

Appellant also contends for a reversal of the judgment, because the court refused to give its requested instruction No. 4-A on assumed risk. The court gave instruction No. 4 requested by appellant upon the same subject, but it is argued that instruction No. 4-A went further by stating that: ''While an employee does not necessarily assume the risk of injury on account of negligence on the part of the employer, yet, if in this case the defendant (appellant) was negligent in permitting its track to get in bad condition, and Bushey, knowing of this condition, continued in the service, appreciating the danger, then he would assume the risk of being injured on account of such conditions.'' The statement referred to in instruction No. 4-A was fully covered by instruction No. 6 given by the court at the request of appellee, when read in connection with instruction No. 4 given by the court, which was requested by appellant. Useless duplications in instructions tend to confuse rather than

help the jury, so trial courts are not required to multiply instructions of like tenor and effect. The court did not err therefore in refusing to give appellant's requested instruction No. 4-A.

Appellant also contends for a reversal of the judgment because the court refused to amend instruction No. 1 on the measure of damages, given by the court at appellee's request, so as to negative a recovery on account of grief or bereavement experienced by appellee and her son, or for loss of companionship and society of appellee on account of the death of her husband, but that the damages sustained, if any, should be confined to the pecuniary loss. The instruction as given by the court confined the damages, if any, which might be awarded, to a fair and reasonable compensation for the loss of pecuniary benefits they might have received had their intestate lived, as shown by the evidence, after reducing the amount to its present cash value, and to such further sum as the preponderance of the evidence might disclose would compensate them for the physical pain and mental anguish which their intestate endured in the interim from the time of his injury until his death. The restriction of damages which might be awarded to loss of pecuniary benefits was a clear, positive direction to the jury of every element they might include, and every element they must exclude in arriving at the amount of damages sustained. Any one of ordinary intelligence would understand from the limitation that appellee and her son could not have received money (pecuniary) benefits from grief, bereavement, deprivation of companionship or society. There was no necessity of negativing such elements of damages, because they were clearly excluded by necessary implication in the instruction given. The failure to amend the instruction as requested had no tendency to mislead the jury, so the court did not err in refusing to add the requested amendment thereto.

Appellant also contends for a reversal of the judgment, because the court refused to give its requested instruction No. 7, which is as follows:

"The court instructs you that if the evidence fails to establish by a fair preponderance thereof that the injury and death of the deceased was due to defendant's negligence, as alleged in the complaint, or that it is equally probable that the injury and death of the deceased were due to the criminal acts of an outsider by moving a rail of the track out of alignment, for whose act the defendant would not be responsible, then, in such event, your verdict should be for the defendant."

The jury was plainly told in other instructions given by the court, that appellee could not recover unless the preponderance of testimony reflected that the injury and death of appellee's intestate resulted from the defective condition of the track, nor if they believed from the evidence that the injury and death of her intestate resulted from the detachment and removal of a rail in the track by some person. These instructions which were given by the court squarely presented the same issue to the jury which instruction No. 7 would have presented had it been given. The court did not err therefore in refusing to give said instruction.

Appellant also contends for a reversal of the judgment, because the verdict was excessive. It is argued that, because appellee's intestate was 53 years of age, and only suffered for three hours from the time of the injury until his death, that the jury, in arriving at the verdict, necessarily considered other elements of damage than those which could be measured by a money standard. This conclusion does not necessarily follow, for, the present cash value of the pecuniary loss to appellee and her son, ascertained on the basis of the legal rate of interest in this State, and under or in accordance with the rule laid down by the Supreme Court of the United States in the case of *Chesapeake & O. R. Co.* v. *Kelly*, 241 U. S. 485, 36 S. Ct. 630, would be $39,037. The expectancy of appellee was 18.79 years, and he was earning a salary of $3,600 a year, all of which he contributed to the support of appellee and his minor

child, except $340 a year. The verdict was for the gross amount of $48,500, and it is therefore impossible to tell the exact amount awarded for the loss of benefits, and that awarded for pain and suffering of appellee's intestate. If the present cash value of the loss of future contributions be deducted from the total award, the jury awarded $9,463 for pain and suffering of appellee's intestate. Considering the intensity and duration of the suffering of the intestate, it cannot be said that a verdict for even very much more than said amount would be excessive. If the present cash value of the amount of total loss of contributions to appellee and her son should be figured on a basis of a lower rate of interest for the use of the money than six per cent. per annum, it would proportionately increase the present cash value thereof, and reduce the amount of the award for pain and suffering. We do not think, under the testimony in the case, that the total amount of the verdict for the loss of contributions and for the pain and suffering of appellee's intestate was excessive.

No error appearing, the judgment is affirmed.