WYMAN MIDDLETON, D/B/A MIDDLETON AND SONS PACKING COMPANY *v.* JACK CATO, D/B/A FROZEN FOOD LOCKERS

5-5685                                      474 S.W. 2d 895

Opinion delivered January 10, 1972

*Hodges, Hodges & Hodges,* for appellant.

*Ponder, Lingo & Hilburn,* for appellee.

J. FRED JONES, Justice. This is an appeal by Wyman Middleton, d/b/a Middleton and Sons Packing Company, from a judgment of the Lawrence County Circuit Court in favor of Jack Cato, d/b/a Frozen Food Lockers, in a suit filed by Middleton against cato for damage to meat stored in Cato's cold storage locker plant.

On or about June 27, 1967, Middleton stored 18,550 pounds of meat in Cato's frozen food locker plant at Walnut Ridge, Arkansas, and paid $185.50 as storage charges for one month. Sometime in the latter part of August, when Middleton removed his meat from Cato's plant, the meat was completely spoiled and was in a high state of putrefaction. Middleton filed suit against Cato for the loss of the meat and claimed damages in the amount of $12,000. Cato filed a general denial and counterclaim alleging that the meat was spoiled when Middleton delivered it to the Cato plant; that Middleton overloaded the facilities of Cato's plant and assumed the risk of the meat spoiling; that Middleton agreed to take a major portion of the meat out of the plant within a matter of several days, but failed and refused to do so. Cato claimed damage to his physical plant and to his business in the amount of $15,000.

Judgment was entered on a jury verdict for Cato on the complaint and for Middleton on the counterclaim. On his appeal to this court Middleton relies on the following points for reversal:

"The trial court committed reversible error in giving defendant's requested instruction No. 1.

The trial court erred in failing to give plaintiff's instruction No. 3.

The trial court should have declared a mistrial when the absence of insurance was mentioned, and it was reversible error to instruct the jury about the word 'insurance' over objections of the plaintiff."

We agree with the appellant that the trial court erred in giving defendant's requested instruction No. 1. Consequently, we are of the opinion that the trial court did not err in failing to give plaintiff's instruction No. 3. We find no merit in the appellant's contention that the trial court should have declared a mistrial when the absence of insurance was mentioned, but we are of the opinion that the trial court's instruction to the jury on the evidence pertaining to the word "insurance" might well have been a comment on the evidence, and that the instruction should not have been given under the circumstances in this case.

There is no question that the meat was completely ruined when Middleton took it out of Cato's plant about the first of September, and there is no question that the temperature where the meat was stored had been maintained at above freezing temperature while the meat was there. Middleton's evidence was directed to his contention that his meat was frozen solid when it was delivered to Cato's plant and it was because of Cato's negligence that proper temperature was not maintained in his plant, and as a result the meat spoiled. Cato's evidence was directed to his contention that Middleton agreed to assume all risks of damage to his meat while it was in Cato's storage plant; that Middleton assumed all risk of damage or loss as a consideration for the privilege of storing the meat; that the meat was not frozen and packaged properly when it was delivered for storage; that some of the meat had already spoiled when Middleton delivered it for storage; that Middleton's own employees improperly stacked the boxes of meat from the floor to the ceiling without use of pallets or other means of air circulation, and that they negligently overloaded the refrigeration capacity of Cato's storage facilities. Both Middleton and Cato offered the testimony of several witnesses in support of their opposite contentions, but their testimony will not be set out in detail

here for the reason that most of it is not important to the conclusion we reach.

We now discuss the points in the order presented. Defendant's instruction No. 1 given by the court is as follows:

"If you find that Middleton, or any of his employees, at the time the first meat was deposited was told that it was being left at Middleton's risk, then you would find for Cato."

Middleton seems to have proceeded at the trial on the theory of tort liability with assumption of risk as a defense, while Cato seems to have proceeded under the theory that Middleton agreed to absolve Cato of all liability in connection with the storage of the meat. Under either theory there is no question that Cato was a bailee of the meat involved in this case.

Mr. Cato did not discuss the contract with Middleton at the time it was made, but according to his testimony as well as that of his plant manager, Jewel Thorn, he authorized Thorn to make the agreement with Middleton for the storage of the meat. According to Mr. Thorn the contract was made with Middleton in a telephone conversation as testified by Thorn as follows:

"A.  Well, I told Mr. Middleton on the telephone that he would put it in there at his own risk and to bring his own labor to handle it, that we wouldn't have no part of it.

\*  \*  \*

A.  He asked me if we had insurance on that kind of stuff and I told him strictly not, that we didn't do that type of business and it was at his own risk.

\*  \*  \*

Q.  Did Mr. Middleton agree to those terms?

A.  Yes, sir, he said he would bring the meat up there, he was glad to get a place to put it."

Mr. Middleton denies that he agreed to assume the risk of his meat spoiling while it was stored in Cato's plant, so approaching the problem under Cato's theory, the legal question involves the limitation placed on Cato's liability by the contract under which Middleton stored the meat in Cato's plant at Middleton's own risk. In 175 A. L. R. § 58, at page 119, is found the following:

"The well-known rule of construction to the effect that contracts exempting one of the contracting parties from liability for his own negligence will be construed strictly against the claimant has frequently prevented the escape of negligent bailees from liability in cases where the terms of the contract of bailmant did not expressly refer to negligence. In any event, however, there is unanimity among the courts in respect to the rule that a bailee cannot exempt himself by contract from the consequences of his own fraud or gross negligence."

In 17 C. J. S., Contracts, § 262, pertaining to Agreements Exempting from Liability for Negligence, is found the following:

"Contracts of this nature are not favored by the law; they are strictly construed against the party relying on them, and clear and explicit language in the contract is required to absolve a person from such liability."

In 92 A. L. R. 2d, at page 1298, is found an annotation concerning "Liability of warehouseman for injury to stored goods as result of failure to maintain proper temperatures," and at page 1319 under subsection 4 [b], pertaining to "Provisions limiting warehouseman's liability for negligence," is found the following:

"Contractual provisions purporting to limit the warehouseman's liability for negligence in maintaining proper temperatures are ordinarily given

close scrutiny by the courts and unless it appears that they were bargained for or were inserted in good faith and with adequate notice to the depositor, will be strictly construed against the warehouseman if enforced at all."

Under this statement are cited many cases including *Arkansas Power & Light Co. v. Kerr,* 204 Ark. 238, 161 S. W. 2d 403, involving the failure of the defendant in the operation of an ice house, to maintain proper temperatures for the preservation of eggs under a contract disclaiming responsibility for the condition of the eggs *while in storage.* We held this provision of the contract unenforceable,

"if by it appellant sought to relieve itself from consequences of its negligence. A consciousness that failure to exercise due care will require compensation for injury to person or property is productive of caution and forethought by those in whose control rest the agencies that may cause damage; hence, public policy is involved when one employing another seeks protection through the instrumentality of contract, although within appropriate limitations not here an issue, conduct and the consequences of physical activities may be circumscribed."

Of course, in *Kerr,* as in most of the warehouse cases, the contract was in printed form and served also as a warehouse receipt. We did not say in *Kerr,* and we do not say now, that it is impossible to avoid liability for negligence through contract. We do say, however, that in order to avoid liability for negligence under a contract, the contract must at least clearly set out what negligent liability is to be avoided.

In the case at bar the verbal agreement, as testified to by Thorn, said nothing at all about the temperature in Cato's plant, but simply stated in broad terms that Middleton would have to place the meat in Cato's plant at his own risk and furnish the labor in placing it there. There were many risks involved in the storage of the meat under the evidence in this case. There was the

risk in stacking the meat on the floor without pallets and without proper and sufficient air circulation. There was the risk of storing the meat in improper packages and containers, and in a thawed or improperly prefrozen condition. There was the risk of fire, electrical and windstorm damage, and, of course, there was the risk of negligent operation of Cato's plant.

The contract, as related by Cato, does not state what risk Middleton was to assume. In any event, we are of the opinion that such vague contract does not, as a matter of law, relieve Cato of all liability for any and all negligence on his part in connection with the storage and preservation of the meat. The mere fact Middleton was told that he was to place the meat in Cato's locker at his own risk and to bring his own labor to handle it, does not, as a matter of law, entitle Cato to a verdict under the conflicting evidence in this case. Such would be the binding effect of defendant's instruction No. 1 and the trial court erred in giving it.

As to Middleton's second point, his requested instruction No. 3 is as follows:

"If you should believe Cato stored the meat of Middleton's on the conditions as stated by Cato, Cato is still required to avoid wilful and wanton negligence in the care and preservation of Middleton's meat."

This instruction was apparently offered to relieve the binding effect of defendant's instruction No. 1 and since the question is not likely to arise at a new trial, we deem it unnecessary to further discuss the assignment under the second point.

As to Middleton's third point, prior to the trial he made a motion in chambers as follows:

"We make a motion in limine to restrict any mention or question about insurance or any relationship of insurance in this case, with either having it or not having any insurance."

This motion was denied by the trial court, and in the course of Mr. Thorn's direct examination, after testifying that he advised Mr. Middleton that he would have to store the meat at his own risk and furnish his own labor in handling it, the record reveals question and answer and objection as follows:

"Q. Why was it that you told him that? Was that your own idea about it?

A. He asked me if we had insurance on that kind of stuff and I told him strictly not, that we didn't do that type of business and it was at his own risk."

A motion was made for mistrial as follows:

"We move at this time for a mistrial on the basis of the mention of insurance, or not having insurance, and it is so prejudicial and it cannot be cured by instruction to the jury and we move for a mistrial."

There is nothing in the above testimony or in the record of this case indicating that Cato's attorney purposely or intentionally elicited the above testimony pertaining to lack of insurance from witness Thorn, and we hold that the trial court did not commit reversible error in denying Middleton's motion for a mistrial. The attorney's purpose and intentions are not quite so clear however, in requesting Cato's instruction No. 2 as follows:

"You are instructed that in the testimony of Jewel Thorn you have heard the word 'insurance.' You are not to be influenced in any manner or degree by the reference to 'insurance.' The use of the word was permitted only because it was a part of the conversation that the defense contends set out the terms of the contract between the parties."

We are of the opinion that this instruction at least, amounted to a comment on the evidence when given

at Cato's request over Middleton's objections, and we are of the opinion that it should not have been given.

The judgment is reversed and this cause is remanded for a new trial.