FARMERS BANK of Greenwood v. Steve PERRY, et al.

89-303                                    787 S.W.2d 645

Supreme Court of Arkansas
Opinion delivered March 19, 1990

*Walters Law Firm, P.A.,* by: *James B. Pierce*, for appellant.

*Robert S. Blatt* and *Mark E. Ford*, for appellees.

TOM GLAZE, Justice. This case comes to us on appeal from a judgment against Farmers Bank, the primary issue on appeal being the admissibility in evidence of an exculpatory clause in the Bank's rental agreement for a safety deposit box.

In June 1979, Wanda, Steve T. and Steve L. Perry, appellees, went to the Farmers Bank of Greenwood, appellant, where they had accounts, to obtain a safety deposit box. Appellees were advised the Bank had no boxes available in Greenwood, but some were available at its branch office in Hartford. Appellees were able to secure a box at the Hartford Branch. The boxes were available only to customers of the Bank and no rent was charged. The Bank obtained the signature of Wanda Perry on the following signature card:

For and in consideration of the undersigned customer's checking or savings account, the Farmers Bank, Hartford, Arkansas, hereby rents SAFETY DEPOSIT BOX NO. _7877_

TO: _STEVE OR WANDA PERRY_

For 12 months beginning _____197___.

The undersigned customer holds the Farmers Bank harmless for loss of currency or coin left in this box.

SIGNED: _Wanda Perry_

On the night of December 22, 1983, the Hartford Branch office was burglarized and 113 of the 120 deposit boxes were broken into. The contents of appellees' box were lost, which included currency and coins. Appellant denied responsibility for the loss, and appellees brought this suit, claiming appellant negligently failed to take proper measures to protect the contents of appellees' safety deposit box.

At trial, the court refused to allow the introduction of the signature card in evidence on the ground that appellant could not contractually eliminate its tort liability. The jury returned a verdict for the appellees in the amount of $20,000, and Farmers Bank has appealed from the judgment entered on the verdict.

As its primary point on appeal, the Bank challenges the trial court's ruling in excluding the signature card from the jury and asks us to reverse on that basis. Arkansas law, however, clearly supports the trial court's decision. In fact, this court has never upheld an agreement purporting to release a party from liability for his own negligence before it occurred. *See Williams* v. *U.S.*, 660 F. Supp. 699 (E.D. Ark. 1987). The rationale behind the numerous decision invalidating so-called releases given before liability arises is based upon the strong public policy of encouraging the exercise of care. *Id.* When construing such release contracts, this court has said that it is not impossible to

avoid liability for negligence through contract; however, to avoid such liability, the contract must at least clearly set out what negligent liability is to be avoided. *Middleton & Sons* v. *Frozen Food Lockers*, 251 Ark. 745, 474 S.W.2d 895 (1972). Finally, contracts which exempt a party from liability for negligence are not favored by the law, and they are strictly construed against the party relying on them.

Here, the appellant Bank prepared the signature card, containing exculpatory language, which says, "The undersigned customer holds the Farmers Bank harmless for loss of currency or coin left in the box." Such language does not expressly exempt the Bank from liability for its own negligence. If it had intended to exempt itself from liability for negligence, the Bank could have more aptly done so in its card or written release. *Cf. Gulf Compress Co.* v. *Harrington*, 90 Ark. 256, 119 S.W. 249 (1909) (where written warehouse receipt provided the company was "not responsible for loss by fire . . . ," and this court held the release did not exempt the company for its negligence, causing fire damage to cotton plaintiff had stored with the company).

In the present case, the record reflects proof that the Bank had been negligent in failing to restore a burglar alarm system that had been inoperative for more than a week prior to, and including, the day burglars entered and stole monies and valuables from the Bank's vault. The vault stored the lock box which contained appellees' valuables that were also stolen. During the trial, the Bank attempted to introduce into evidence its signature card — signed by appellee Wanda Perry — with its disclaimer for loss of currency and coins. The trial judge excluded the card, holding the Bank could not "sweep away" its tort liability through the card's introduction. We believe the trial judge correctly concluded the Bank's disclaimer failed to contain language that removed the Bank's liability for negligence. That being so, he was also correct in excluding the disclaimer from evidence because it was irrelevant.

Appellant Bank also objects to the court's refusal to allow certain testimony from an expert. During the trial, the appellant called Ken Sanders, who was at the time working for another bank, but who has previously worked as a bank examiner. Appellant argues that Sanders testified to a number of matters,

but the court, upon objection from appellees, refused to let him testify about security measures exercised by appellant in comparison to branch banks of similar sized communities within the state.

Neither the objection nor the discussion between the trial judge and the attorneys is abstracted with regard to this point. Further, Sanders' proffered testimony, if any, does not appear in the abstract, as well. Therefore, without going to the record, we cannot determine whether the trial court erred. As we have stated numerous times, we will not go to the single record to determine whether reversible error has occurred. *See Boren v. Qualls*, 284 Ark. 65, 680 S.W.2d 82 (1984); *First National Bank of Brinkley v. Frey*, 282 Ark. 339, 668 S.W.2d 533 (1984).

Appellant also sought to introduce testimony of six customers reflecting that they had been told not to keep currency or coins in their safety deposit boxes. Specifically, the proffered testimony was to the effect that the witnesses had been instructed by Connie Ford, the Bank's branch manager, that the boxes were not provided for the purpose of keeping valuables, but were only for storing important papers and documents. One witness offered testimony that it was "common knowledge of the community" that these boxes were only for important papers. Appellant offered testimony of these witnesses to undergird its efforts to introduce the Bank's disclaimer signed by appellees and to show the applicable standard of care. Under the circumstances of the cases and in view of our earlier discussion and holding that the Bank's disclaimer was inadmissible, we agree with the trial court's ruling that these witnesses' testimony was irrelevant. As we have said repeatedly, rulings on the relevancy of evidence are discretionary with the trial court, and we do not reverse absent an abuse of discretion. *Jim Halsey Co. v. Bonar*, 284 Ark. 461, 683 S.W.2d 898 (1985); A.R.E. Rule 104.

Appellant also contends the trial court erred in refusing to instruct the jury on the proper duty of care. One instruction classified the Bank as a gratuitous bailee, there being proof that the boxes were provided without charge. But the signature card expressly states that the box is given in consideration of checking or savings accounts held by the bailor and only patrons with accounts at the Bank were given boxes. A bailment for the mutual

benefit of the parties is not a gratuitous bailment. *See Hinkle* v. *Perry*, 296 Ark. 114, 752 S.W.2d 267 (1988); *Warren* v. *Geater*, 206 Ark. 518, 176 S.W.2d 242 (1943).

In addition, appellant wanted an instruction defining negligence in comparison to the standards of similar banks. It was not error to refuse an instruction on this point, as there was no evidence of other standards.

In its next point for reversal, appellant argues the trial court erred when it allowed appellees to impeach a witness with an inadmissible prior inconsistent statement. Appellees had called the branch manager, Connie Ford, who testified that the burglar alarm had been inoperative "for a few days." The appellees sought to impeach this testimony with a prior inconsistent statement. Ms. Ford had talked to an FBI agent after the burglary and told him that the alarm had been out for a much longer time than a few days prior to the burglary. Appellee read the statement taken by the FBI agent and asked Ms. Ford if that is what she had told him. The appellee never asked that the statement be admitted into evidence and only read it verbatim, at the suggestion of the court, when the witness could not remember the contents of the statement she had made to the agent.

Appellant's objection below is not entirely clear, but we interpret the objection as being: 1) appellees had refused to give the statement to appellant earlier when requested and 2) had refused to call the FBI agent as a witness. On appeal, appellant argues that it was 1) hearsay, 2) unauthenticated, and 3) appellant was entitled to see the statement before it was offered into evidence.

The appellees could properly examine the witness about a prior inconsistent statement for impeachment purposes under A.R.E. Rule 613. That rule also provides that the statement or its contents need not be disclosed at that time, but on request shall be shown to opposing counsel. This answers the only objection that was made both below and on appeal. We note that there was never any request by appellee that this be used as substantive evidence under A.R.E. Rule 801(d)(1), nor could it have been so treated in this case. The statement of the agent was hearsay, the statement of Ms. Ford was not. Nevertheless, her statement could have been admissible under A.R.E. Rule 613 for

impeachment purposes. *See Chisum* v. *State*, 273 Ark. 1, 616 S.W.2d 728 (1981). Aside from the evidentiary rule arguments now made by the Bank, we note that none would have been prejudicial error even if one of them had merit, since the F.B.I. report, containing Ms. Ford's statement, was allowed to be introduced without objection.

■ Finally, the appellant contends certain errors arose in the selection and voir dire of the jury. Again, we find no merit in appellant's contentions. First, the appellant argues that because the trial court failed to ask preliminary questions of the prospective jurors there was no showing that the veniremen met the requirements of a juror as set out in Ark. Code Ann. § 16-31-101 (1987), such as being a registered voter and a citizen of the United States. Further, the appellant contends that when faced with only having nineteen prospective jurors, the trial court erred in continuing the trial for a short time to allow the sheriff to try and contact jury members of other panels. We have held that under statute as well as practice in this state, it is too late, after the rendition of a verdict, to raise the ineligibility of a juror, unless it can be shown by the complaining party that diligence was used to ascertain his disqualifications and prevent his selection as a juror. *See Ark. State Highway Comm.* v. *Kennedy*, 233 Ark. 844, 349 S.W.2d 133 (1961); *Missouri Pacific R.R. Co.* v. *Bushey*, 180 Ark. 19, 20 S.W.2d 614 (1929). Since below, the appellant accepted the jury as "good for the defense" and raised no objection to the method of selection until its motion for a new trial, the appellant has waived his right to question the jury panel.

■ Next, the appellant alleges that its motion for a new trial should be granted because, during voir dire, one of the jurors failed to reveal that her in-laws were related to the appellees by marriage. *See* Ark. Code Ann. § 16-31-107 (1987). Pursuant to Ark. Code Ann. § 16-31-102(b)(1) (1987), except by the consent of all parties, no person shall serve as a petit juror in any case who is related to any party or attorney in the cause within the fourth degree of consanguinity or affinity.

■ We have defined affinity as the tie which arises from marriage between the husband and blood relations of the wife and between the wife and the blood relations of the husband. *Mitchell* v. *Goodall*, 297 Ark. 332, 761 S.W.2d 919 (1988).

Based on this definition, we have held that there can be no affinity between the blood relations of the husband and the blood relations of the wife. *Id.* Clearly, here the juror would not be disqualified to serve on the jury under § 16-31-107 (1987). In addition, we note that the juror stated that there were no factors that would prevent her from rendering a fair impartial decision based on the law and evidence in this case. We also mention that this same juror revealed in voir dire that her father-in-law was one of the witnesses who was expected to testify in behalf of the appellant. Thus, the trial court did not abuse its discretion in denying the appellant's motion for a new trial.

HOLT, C.J., and HAYS and TURNER, JJ., dissent.

STEELE HAYS, Justice, dissenting. Notwithstanding the fact that the appellees expressly agreed "to hold Farmers Bank harmless for loss of currency or coins" left in the safety deposit box, the trial court refused to permit the introduction of that provision in the trial of this case. Thus that evidence was excluded from the jury. The majority opinion asserts that Arkansas law "clearly supports the trial court's decision." I respectfully disagree.

The majority relies entirely on two decisions of this court [*Middleton & Sons* v. *Frozen Food Lockers*, 251 Ark. 745, 474 S.W.2d 895 (1972) and *Gulf Compress Company* v. *Harrington*, 90 Ark. 256, 119 S.W. 249 (1909)] and one decision of the United States District Court for the Eastern District of Arkansas, *Williams* v. *United States*, 660 F. Supp. 699 (1987). However, none of those decisions is on the point we are being asked to decide. Those cases recite the general principle that exculpatory clauses are not favored in the law and are strictly construed because they tend to induce a want of care and allow a party to avoid liability of a common law duty. 57A Am. Jur. 2d *Negligence* § 49 (1989).

But exculpatory clauses are not invalid per se. The law is aptly summarized in 17 C.J.S. *Contracts* § 262 (1963):

> It is generally held by many jurisdictions that one may contract for such exemption, except where prohibited by statute or some overriding consideration of public policy, particularly when the obligee is under no disadvantage by

> reason of confidential relationship, disability, inexperience, or necessities of the situation. As otherwise expressed, in cases where the public interest of some statutory prohibition are not involved, it is permissible for a party to contract to absolve himself from liability for future negligence.

Yet the majority opinion offers no statutory prohibition against this type of exculpatory clause nor makes any attempt to analyze whether public policy overrides a provision the parties themselves found agreeable. Certainly none of the three cases cited provides that authority.

*Williams* v. *United States, supra*, is a suit under the federal tort claims act. Admissibility of the exculpatory clause was not an issue. The trial judge, sitting as a jury as required under the act, considered the provision and held that it was not sufficiently explicit to defeat liability for the death of a child caused by the negligence of agents of the United States.

Nor do the *Harrington* and *Middleton* cases, *supra*, afford a stronger base for the majority position. If anything, they give support to the argument that the jury is entitled to consider such provisions under appropriate instructions of the law. In *Harrington*, Gulf (a public warehouse) accepted Harrington's thirty-four bales of cotton for storage, issuing receipts which recited "not responsible for loss by fire, acts of Providence, natural shrinkage, old damage, or failure to note concealed damage." The cotton was destroyed by a fire caused by Gulf's negligence. Harrington sued and his recovery was affirmed on appeal. Again, admissibility of the exculpatory clause as evidence was not an issue, Gulf was seeking to uphold the cause *as a matter of law*. Moreover, the clause in that case was an attempt to exclude all liability for loss or damage attributable to a wide variety of *causes*, whereas the provision now before us purports only to exclude liability for loss to a *particular type of property* — coins and currency. Thus, Gulf knew exactly the nature and value of the property it was accepting, whereas, the bank contends it was not privy to the contents of its depositors' lock boxes and in that circumstance there is a greater need for latitude in contracting for reasonable limits on the type of property deposited.

The clause in *Harrington* was overbroad and failed to inform

the bailor that the bailee was excluding liability not only for fire for which a bailee would not be accountable (such as arson or fire which spread from other premises), but was also excluding fire which was the result of the bailee's own negligence. In that situation this court held, correctly, that if the bailee was seeking to avoid liability for its own negligence that must be clearly stated. No similar deficiency exists in this case. The language in *Harrington* was addressed entirely to potential *causes* of loss, whereas the language here does not advert to causes, but to a particular type of property, coins and currency, property with a high risk factor.

This case more nearly resembles the *Middleton* case. In *Middleton*, the bailor, stored 18,000 pounds of meat in Cato's frozen food locker under an agreement, according to Cato, that the storage was "at Middleton's risk." The meat rotted and Middleton sued for the value of his meat and Cato counter-sued for damage to his plant and business. The jury declined to award damages to either and on Middleton's appeal the case was reversed and remanded because of error by the trial court in instructing the jury that if it found the meat was stored "at Middleton's risk" it should find for Cato.

The admissibility of the exclusionary clause was not disputed either before the trial court or the appellate court—its admissibility was a foregone conclusion—but the instruction given had the effect of upholding the clause as a matter of law by telling the jury that if it found the storage was "at Middleton's risk", *it must find for Cato*. That was error. The jury should have been instructed that under the law such provisions must be clear and explicit and strictly construed against Cato, the party seeking to rely on it. So instructed, the jury could then decide whether the clause met those requirements of the law.

Additionally, here the trial court rejected as irrelevant proffered testimony by Ms. Connie Ford, branch manager of the bank, that she told the bank's customers that coins and currency were not to be kept in the box, only documents such as wills and deeds. While the appellees take issue with that assertion, it was of course for the jury to determine whether the bank knew it was being made the custodian of coins and currency and, if so, to determine the extent of its exposure to a loss arising from such

custody. That consideration was sensibly analyzed in relation to exculpatory clauses by the concurring opinion in *Real Good Food Stores, Inc.* v. *First National Bank of Oregon*, 276 Or. 1057, 557 P.2d 654 (1976), involving liability for night deposits:

> [U]sually, the bailor, after transferring possession of the goods to the bailee, is unaware of the disposition made of his property. For this reason the bailor is entitled to a presumption of negligence on the part of the bailee if the goods are not returned upon demand. And for the same reason, it may be unreasonable to allow a public bailee to disclaim responsibility for stored goods by an exculpatory clause. But where the bailee has no knowledge of the value or contents of stored goods *or even that goods have been entrusted*, as here, a different rule is called for. [Emphasis in original.]

That reasoning, I submit, is soundly applicable to safety deposit boxes. Unlike bailments generally, a safety deposit box holder has access to the contents of the box which is at least equal to, and probably greater than, that of the bank. Neither can acquire the box itself without the other, but once acquired, the customer then has access *to the contents* in the privacy of a booth, or at least beyond the ken of the bank employees. What is removed from or added to the box is largely a matter which the customer alone determines.

In view of the foregoing it seems to me to be especially tenuous to conclude that this provision is against public policy, assuming that is the implicit holding of the majority. In *Bene* v. *New York Life Insurance Co.*, 191 Ark. 714, 87 S.W.2d 979 (1935), we said:

> As to whether a contract is against the public policy is a question of law for the court to determine from all the circumstances of each case. Persons should not be unnecessarily restricted in their freedom to make contracts, and a court will not hold that a contract is void, as being contrary to public policy, unless the contract binds one to do something which is injurious to the public interest.

I find nothing injurious to the public interest in permitting a jury to determine from all the evidence whether these parties are

bound under the applicable law by the agreement they entered into.

Holt, C.J., and Turner, J., join this dissent.