NATIONAL UNION FIRE INSURANCE COMPANY
of Pittsburgh, Pennsylvania *v.* GUARDTRONIC, INC.,
and National Guardian Security Services Corporation

CA 00-1464                                    64 S.W.3d 779

Court of Appeals of Arkansas
Division III and IV
Opinion delivered January 9, 2002

*Mitchell, McNutt & Sams,* by: *Otis R. Tims* and *Hardin, Jesson & Terry,* by: *J. Rodney Mills,* for appellant.

*Wright, Lindsey & Jennings LLP,* by: *Gregory T. Jones,* for appellee.

OLLY NEAL, Judge. In August of 1994, a fire occurred at the Crain Industries foam manufacturing plant in Fort Smith, causing substantial property damage and the death of one employee. Appellees Guardtronic and National Guardian provided fire detection equipment and monitoring services to the plant. In 1996, Crain's property and casualty insurer, appellant National Union Fire Insurance Company, having paid Crain over eleven million dollars in policy proceeds, sued appellees alleging *inter alia* that appellees' systems failed to send a timely signal to the monitoring stations and, in turn, the monitoring stations failed to quickly notify the fire department. The complaint set forth theories of negligence, products liability, misrepresentation, and breach of warranty. Appellees defended on the basis of exculpatory clauses contained in their contracts. The trial judge enforced the clauses and granted summary judgment to appellees. We affirm.

The exculpatory language in question is contained in the alarm-system contracts entered into between Crain and appellees.[1] The Guardtronic contract was executed on June 21, 1978. It provided that, for a fee of $195 per quarter (later raised to $298.16 per quarter), Guardtronic would provide Crain's plant with a smoke and heat detection system and would monitor the system at its central office. The contract contained the following pertinent provision:

> IT IS AGREED THAT THE COMPANY IS NOT AN INSURER and that the payments hereinbefore named are based solely upon the value of the services herein described and it is not the intention of the parties that Company [Guardtronic] assume

---

[1] National Guardian's contract was executed by its predecessor Spurling Fire & Burglar Alarm Company.

responsibility for any loss occasioned by malfeasance or misfeasance in the performance of the services under this contract, or for the loss or damage sustained through burglary, theft, robbery, fire or other cause or any liability on the part of Company by virtue of this Agreement or because of the relation hereby established.

IF THERE SHALL, NOTWITHSTANDING THE ABOVE PROVISIONS, AT ANY TIME BE OR ARISE ANY LIABILITY ON THE PART OF THE COMPANY BY VIRTUE OF THIS AGREEMENT OR BECAUSE OF THE RELATION HEREBY ESTABLISHED, WHETHER DUE TO THE NEGLIGENCE OF THE COMPANY OR OTHERWISE, SUCH LIABILITY IS AND SHALL BE LIMITED TO A SUM EQUAL IN AMOUNT TO THE RENTAL SERVICE CHARGE HEREUNDER FOR A PERIOD OF SERVICE NOT TO EXCEED SIX (6) MONTHS, WHICH SUM SHALL BE PAID AND RECEIVED AS LIQUIDATED DAMAGES. SUCH LIABILITY AS HEREIN SET FORTH IS FIXED AS LIQUIDATED DAMAGES AND NOT AS A PENALTY AND THIS LIABILITY SHALL BE COMPLETE AND EXCLUSIVE.

That in the event Subscriber desires Company to assume greater liability for the performance of its services hereunder, a choice is hereby given of obtaining full or limited liability by paying an additional amount under a graduated scale of rates proportioned to the responsibility, and an additional rider shall be attached to this Agreement setting forth the additional liability of Company and additional charge. That the rider and additional obligation shall in no way be interpreted to hold company as an insurer.

The National Guardian contracts — a lease contract and a monitoring contract — were executed in 1986 and 1987.[2] The lease contract provided that, for $107 per month, Crain would lease a system from National Guardian to detect water flow from Crain's own sprinklers. The monitoring contract provided that National Guardian would monitor the system from its central office. Both contracts contained an exculpatory provision that was virtually identical to the Guardtronic provision set out above, the only significant difference being the following language:

---

[2] The contracts attached by National Guardian to its motion for summary judgment were somewhat pieced–together because the originals were lost in the 1996 Fort Smith tornado and because a copyist failed to copy the contracts in their entirety. There is no dispute, however, that the contracts are authentic and accurate.

THAT IN THE EVENT LESSEE DESIRES PROTECTION FOR LOSS OR DAMAGES AS A RESULT OF BURGLARY, THEFT, ROBBERY, FIRE OR OTHER CAUSE, LESSEE AGREES TO PURCHASE AN INSURANCE POLICY FROM A THIRD PARTY TO COVER SAID LOSS OR DAMAGE.

Following discovery, appellees filed motions for summary judgment arguing that they were either absolved from liability or their liability was limited by the above-quoted clauses. The trial judge agreed, finding that the clauses were not ambiguous; that parties are generally free to contract as they wish and Crain had voluntarily entered into these contracts and accepted the benefits thereof; and that the contracts were not ones of adhesion but were arms-length transactions between businesses. From that ruling comes this appeal.

In summary-judgment cases, we need only decide if the grant of summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion left a material question of fact unanswered. *Inge v. Walker,* 70 Ark. App. 114, 15 S.W.3d 348 (2000). Summary judgment is no longer considered a drastic remedy, but is regarded simply as one of the tools in the trial court's efficiency arsenal. *See Wallace v. Broyles,* 332 Ark. 189, 961 S.W.2d 712 (1998). The burden of sustaining a motion for summary judgment is always the responsibility of the moving party. *Inge v. Walker, supra.* All proof submitted must be viewed in a light most favorable to the party resisting the motion, and any doubts and inferences must be resolved against the moving party. *Id.*

An exculpatory contract is one in which a party seeks to absolve himself in advance for the consequences of his own negligence. Our supreme court has a history of viewing exculpatory contracts with disfavor. *See Farmers Bank v. Perry,* 301 Ark. 547, 787 S.W.2d 645 (1990); *Middleton & Sons v. Frozen Foods Lockers,* 251 Ark. 745, 474 S.W.2d 895 (1972); *Arkansas Power & Light Co. v. Kerr,* 204 Ark. 238, 161 S.W.2d 403 (1942); *Gulf Compress Co. v. Harrington,* 90 Ark. 256, 119 S.W. 249 (1909). Such contracts are not invalid *per se.* In fact, they have been upheld in two Arkansas cases. *See Plant v. Wilbur,* 345 Ark. 487, 47 S.W.3d 889 (2001); *Edgin v. Entergy Operations, Inc.,* 331 Ark. 162, 961 S.W.2d 724 (1998). Because of the disfavor with which exculpatory contracts are viewed, two special rules of construction apply to them. First, they are to be strictly construed against the party relying on them. *Farmers Bank v. Perry, supra.* Second, to be enforceable, the contract

must clearly set out what negligent liability is to be avoided. *Plant v. Wilbur, supra.*

Appellant's initial contention on appeal is that the trial judge did not apply the special rules associated with exculpatory clauses, but instead focused on such factors as whether the contracts were ambiguous, whether Crain accepted the benefits of the contracts, and whether the contracts were freely and voluntarily entered into. We see no error here. The trial judge's ruling, although it did not expressly mention the special rules, did not expressly reject them. In fact, the judge's lengthy discussion of the enforceability of the clauses indicates his understanding that such clauses must be strictly scrutinized. Further, our supreme court has considered, in ruling on exculpatory clauses, the ambiguity, or lack thereof, of the contract language, *see Edgin v. Entergy Operations, Inc., supra,* and the circumstances surrounding the execution of the contract, *see Plant v. Wilbur, supra.* Therefore, we cannot say that the trial court took the wrong approach in considering those same factors.

We begin our analysis by addressing appellant's argument that a fact question remains as to whether Crain freely and voluntarily entered into the contracts with appellees. Appellant points to the affidavit of John Crossley, who signed the Guardtronic contract on behalf of Crain, wherein he stated that he would not have signed the contract had he been aware it contained provisions attempting to relieve Guardtronic of responsibility for failing to alert authorities in a timely manner. Appellant also cites the depositions of Guardtronic salesman Billy Johnson and National Guardian salesman Calvin Evans, evidencing that they did not understand the full exculpatory nature of the contracts. However, there was no proof that appellees induced Crain into believing the contracts were anything other than what they were. The language of the contracts was there for all parties to read; it was conspicuous; and there is no proof it was misrepresented in any way. Appellant offered no evidence of fraud, duress, undue influence, lack of capacity, mutual mistake, or inequitable conduct sufficient to void the contracts. Its reliance on Crain's misunderstanding of the contract is therefore not well-taken. One is bound under the law to know the contents of the papers he signs, and he cannot excuse himself by saying that he did not know what the papers contained. *Carmichael v. Nationwide Life Ins. Co.,* 305 Ark. 549, 810 S.W.2d 39 (1991).

Appellant also argues that Crain's execution of the contracts was not voluntary because the contracts were form contracts, not subject to negotiation. Even if it is true that the contract

provisions were non-negotiable, it does not follow that Crain's execution of the contracts was involuntary. There is no evidence that Crain wanted to or attempted to change any terms of the contracts. Additionally, Crain was free to take its business elsewhere if it was unhappy with the contracts at issue. Finally, as mentioned earlier, there is no proof of any inequitable conduct or mutual mistake in connection with the execution of the contracts.

■ Along these same lines, appellant argues that the contracts were unconscionable both because they were form contracts and because of the gross inequality of bargaining power between Crain and appellees. In assessing whether a particular contractual provision is unconscionable, courts should review the totality of the circumstances surrounding the negotiation and execution of the contracts. *State v. R & A Inv. Co.*, 336 Ark. 289, 985 S.W.2d 299 (1999). Two important considerations are whether there is a gross inequality of bargaining power between the parties and whether the aggrieved party was made aware of and comprehended the provision in question. *Id.* We have already rejected appellant's argument that Crain's representative did not comprehend the presence of an exculpatory provision; the provision was available for him to read. Regarding the inequality of bargaining power, Crain is a large corporation that has used limitation of liability clauses in its own contracts. Further, there were competing alarm companies operating in Fort Smith from which Crain could have acquired similar services.

■ Based upon the forgoing, we hold that there was no error in the trial judge's determination that Crain freely and voluntarily entered into the contracts in question.

We turn now to the question of whether the exculpatory provisions recited earlier are enforceable under Arkansas law. The Arkansas Supreme Court has decided numerous cases involving exculpatory clauses. The seminal case is the 1909 case of *Gulf Compress v. Harrington, supra*. There, Gulf Compress stored bales of cotton for Harrington, and the bales were subsequently destroyed by fire. Harrington contended that Gulf was guilty of negligence, and Gulf defended on the basis of language in Harrington's receipt, which read, "[n]ot responsible for loss by fire, acts of Providence, natural shrinkage, old damages, or for failure to note concealed damages." The supreme court held that such language was insufficient to exempt Gulf from liability for its own negligence.

The same result was reached in three subsequent bailment cases. In *Arkansas Power & Light v. Kerr, supra*, where the bailor

contended that the bailee stored his eggs at an incorrect temperature, the purported exculpatory language read, "company is not responsible for [goods'] condition while in storage or at their removal; nor for loss or damage by fire, water, storm or other causes reasonably beyond its control. . . ." In *Middleton & Sons v. Frozen Food Lockers, supra,* where the bailor's meat spoiled while being stored by the bailee, there was an alleged verbal contract in which the bailor agreed to assume the risk of damage to his meat. In *Farmers Bank v. Perry, supra,* where Perry's money was stolen from one of the Bank's safety deposit boxes, the contract read, "the undersigned customer holds the Farmers Bank harmless for loss of currency or coin left in this box." All of these exculpatory agreements were held insufficient to absolve the bailee of liability for its own negligence.

Two recent cases have upheld exculpatory contracts. In *Edgin v. Entergy Operations, Inc., supra,* Michele Edgin sustained injuries while working at Entergy's Nuclear One plant as a security guard. Her actual employer was Wackenhut Corporation, who assigned her to Entergy. Following her injury, Edgin sued Entergy in tort, and Entergy defended on the basis of a document that Edgin had signed in her Wackenhut employment application. The document read, in pertinent part, "I HEREBY WAIVE AND FOREVER RELEASE ANY RIGHTS I MIGHT HAVE to make claims or bring suit against any client or customer of Wackenhut for damages based upon injuries which are covered under . . . Workers' Compensation statutes." The supreme court held that the clause specifically set out what negligent liability was to be avoided and was clear and unambiguous.

A more traditional type of exculpatory contract was discussed in *Plant v. Wilbur, supra,* a case decided by the supreme court last July. There, Plant signed a document before entering the pit area of a racetrack operated by Wilbur. The document, which was a form used by racetracks all over the country, was titled, "Release and Waiver of Liability and Indemnity Agreement." The supreme court held that the clause was enforceable, noting that it contained certain key phrases such as "releases," "discharges," "covenants not to sue," and mentioned claims for negligence in three different places. The court also approved the trial judge's consideration of the circumstances surrounding the execution of the document, such as the fact that Plant had signed the document on other occasions, was not forced to sign the document, had equal bargaining power, and the fact that the activity involved was recreational in nature.

■ Under the forgoing authority, we must strictly construe the exculpatory contracts in the case at bar against the alarm companies, and we must ask whether they clearly set out what negligent liability is to be avoided. The contracts do not expressly mention that appellees sought to be absolved from liability for their own negligence, nor do they use words such as "release" or "waiver" as did the contracts in *Plant* and *Edgin*. However, the contracts do state that it is not the intention of the parties that appellees assume responsibility for any loss occasioned by "malfeasance or misfeasance in the performance of the services under the contract, or for loss or damage from fire." Our courts view misfeasance as an affirmatively wrongful act generally equated with a tort. *See Westark Specialties v. Stouffer Family Ltd.*, 310 Ark. 225, 836 S.W.2d 354 (1992). The logical reading of the terms as they are used in these clauses is that appellees assume no responsibility for tortious performance of services under the contract. This interpretation is further buttressed by the fact that both contracts provide for a limitation of liability to a small amount of money should the exculpatory provision be invalidated; that the Guardtronic contract goes on to offer the customer the option of paying more money to obtain full or limited liability on the part of Guardtronic; and that National Guardian advised its customers to purchase an insurance policy to protect against loss from fire and other hazards. We therefore hold that the contracts clearly set out what negligent liability is to be avoided.[3]

■ We further hold that there is nothing in the circumstances surrounding the execution of the contracts that would merit invalidating the exculpatory clauses. The parties herein were businesses dealing at arms' length. The clauses were not hidden from Crain, nor was Crain misled or prevented from reading the clauses. Further, Crain paid a relatively meager amount for appellees' services, and appellees sought accordingly to either absolve themselves from liability for their own negligence or limit their liability to a small dollar amount. Finally, as it was urged to do in the National Guardian contract, Crain purchased insurance (from appellant National Union) to cover losses of the type suffered herein.

In light of our discussion, we hold that the trial court did not err in granting summary judgment in this case.[4]

---

[3] Appellant does not raise as a point on appeal that the clauses do not apply to its causes of action other than negligence, *i.e.*, products liability, breach of warranty, or misrepresentation.

[4] Appellant makes two arguments that we do not address. First, it argues that the trial

Affirmed.

HART, ROBBINS, and VAUGHT, JJ., agree.

CRABTREE and BAKER, JJ., dissent.

TERRY CRABTREE, Judge, dissenting. I disagree with the majority that the exculpatory clauses in this case clearly set out what negligent liability appellees sought to avoid. The clauses do not mention the word "negligence" at all, nor do they state that the signator on the contract is waiving any rights or releasing any party from liability. Those omissions distinguish this case from the supreme court's holdings in *Plant v. Wilbur*, 345 Ark. 487, 47 S.W.3d 889 (2001), and *Edgin v. Entergy Operations, Inc.*, 331 Ark. 162, 961 S.W.2d 724 (1998). Further, I do not believe the clauses are saved by the use of the term "malfeasance or misfeasance." The supreme court has always mandated that strong, clear language be used in seeking to absolve oneself of liability. Those words fall short of that mandate. Without more, they are not sufficient to inform a contracting party that he may be giving up his right to hold the other party liable for negligence.

To hold that these contracts clearly set out what negligent liability is to be avoided is to impermissibly extend the holdings of *Edgin, supra,* and *Plant, supra,* beyond what the supreme court intended. I therefore respectfully dissent and am authorized to state that Judge Baker joins in this dissent.

BAKER, J., agrees.

---

court erred in citing the exculpatory clause from the National Guardian *lease* agreement rather than the *monitoring* agreement. The trial court's reliance on the lease agreement clause makes no difference because it is virtually identical to the monitoring agreement clause. Second, appellant argues that the monitoring agreement itself is vague because it states that it agrees to monitor a system "owned by Subscriber." Because the alarm system was owned by National Guardian and was only leased by Crain, appellant contends that the monitoring agreement does not apply. The record as abstracted does not show that this argument was made below; certainly it was not ruled on by the trial judge. We need not address an argument under such circumstances. *See Barclay v. First Pyramid Holding Co.*, 344 Ark. 711, 42 S.W.3d 496 (2001). In any event, the lease and the monitoring agreement were intertwined as a practical matter. Appellant also argues briefly that the trial court erred in finding that appellees were not grossly negligent. No convincing argument is made, nor is any authority cited in support of this contention; therefore, we do not address it. *See Collins v. Cunningham*, 71 Ark. App. 297, 29 S.W.3d 764 (2000).